## GUARDIAN TRUST CO. v. BAUEREISEN.

### No. 10278.

Court of Civil Appeals of Texas. Galveston.

Oct. 15, 1936.

Dissenting Opinion Oct. 20, 1936.

Rehearing Denied Nov. 12, 1936.

Baker, Botts, Andrews & Wharton, John T. McCullough, and G. G. Gannon, all of Houston, for appellant.

Vinson, Elkins, Sweeton & Weems, David T. Searls, A. D. Dyess, and Joel W. Cook, all of Houston, for appellee.

Peareson & Peareson, of Richmond, for Nueces Lands Irrigation Company.

GRAVES, Justice.

This statement from the appellant's brief—revised in only two particulars, as suggested by the appellee—is thought to be correct:

"This suit was filed April 17, 1933, by R. J. Bauereisen, son-in-law of W. T. Eldridge, against Nueces Lands Irrigation Company, a corporation, and Guardian Trust Company, Independent Executor under Mr. Eldridge's will, in the district court of Fort Bend County, Texas. It was tried before the court without a jury, and judgment was entered December 1, 1934, in favor of the plaintiff, and against Guardian Trust Company, in its capacity as Independent Executor under the will of W. T. Eldridge, deceased, for the sum of $40,000.00, and against plaintiff on his claim against Nueces Lands Irrigation Company.

"Appellee, the plaintiff below, declared upon two written contracts, both dated July 26, 1928, copies of which were made exhibits to his first amended original petition, upon which he went to trial. One of these contracts was executed by himself and the defendant Nueces Lands Irrigation Company, and the other by himself and W. T. Eldridge. By the terms of the first

contract the Irrigation Company employed Bauereisen as its general manager, for a period of five years, beginning September 1, 1928, at a salary of $700.00 per month, and agreed to provide a house, suitable for the occupancy of Bauereisen, and his family, on the company's property in Dimmit County, Texas. Bauereisen agreed to devote his best efforts and entire time to the management of the affairs of the company, but the company agreed he might contract for the drilling of wells or other work in Texas if such contracts could be made and performed without causing him to neglect his duties as general manager of the company, provided he first received the written consent of the company through its president. Bauereisen agreed to move his drilling rig to the company's property in Dimmit County (he then being a resident of Chicago), and to use the same in drilling water wells on said property, and the company agreed to pay the freight and other costs of transporting the rig and tools to its property and the expense of moving his household belongings and office furniture and fixtures to Dimmit County, and to pay him at the rate of 60¢ for each foot drilled with said rig and $10 per day for rig work other than drilling.

"In the contract between Bauereisen and Eldridge, Eldridge agreed, as an inducement to Bauereisen to execute the contract with the irrigation company, to give him one-half of all dividends which might be declared within the next five years on stock of the company then belonging to Eldridge, or acquired by Eldridge within that time, and, subject to the other terms of the contract, guaranteed the payment to Bauereisen of the salary specified in his contract with the irrigation company. By an additional provision of said contract, Eldridge agreed further that in the event he foreclosed within said five-year period the liens which he held against the properties of the irrigation company, he would retain Bauereisen as general manager of the company and divide equally with him the net profits realized from the operation or sale of its properties during said five-year period; and that in the event he sold or assigned during said five-year period his stock in and liens against the company, or the company sold all its properties to a third party, Bauereisen 'shall have the election of receiving from first party (Eldridge) the salary for the remaining portion of said five-year period at the rate of $700.00 per month, or of receiving one-half of the profit realized by first party on the transaction, first party receiving his entire investment plus 6% interest before any profit shall be considered to have been earned. Second party's (Bauereisen's) right to receive the salary for the remaining portion of said period upon his electing to do so upon the happening of either of the above contingencies, shall be conditional upon his devoting his time and services somewhere in the United States for the benefit of first party as first party may direct.' Bauereisen agreed that Eldridge should receive one-half of all net profits realized during said five-year period from any operations he conducted in drilling wells or selling well equipment.

"Bauereisen alleged that after the aforedescribed contracts were executed, he entered upon the performance of his contract with the irrigation company and continued in its employ until April 19, 1929, and would have continued performance for the full five-year term thereof, but the company refused to perform the contract after said date and to pay him the stipulated salary of $700.00 per month, except that by an agreement made in December, 1929, a certain sum of money was accepted by him in satisfaction of his claims which had accrued prior to June 1, 1929, without prejudice to any claims arising after that date; and the company also required him to vacate the house which he occupied on its premises and thereby compelled him to secure another at a cost of $100.00 per month during the remainder of the contract term. Bauereisen further alleged in substance that he had at all times been willing and ready to perform the contract with the irrigation company; that during the period since the contract had been breached he had been able to earn not to exceed $6500.00; that thereby the irrigation company had damaged him to the extent of $40,000.00; that W. T. Eldridge was liable to him as guarantor of the salary agreed to be paid him by the irrigation company, and that he having died August 20, 1932, and Guardian Trust Company having been appointed and qualified as Independent Executor under his will, it was liable to him in such capacity."

In its first amended original answer, Guardian Trust Company, as independent executor under the will of W. T. Eldridge, deceased, appellant herein, interposed a

general demurrer and general denial to the aforementioned petition, and alleged: "That on or about April 1, 1929, W. T. Eldridge sold to the Sugarland Industries all of his stock in and notes and liens against Nueces Lands & Irrigation Company and promptly thereafter notified plaintiff of such sale. Upon being notified of such sale, plaintiff elected to receive from First Party the Salary for the remaining portion of said five-year period at the rate of Seven Hundred ($700.00) Dollars per month. Said W. T. Eldridge arranged for the plaintiff to be employed in the State of Oklahoma by a corporation known as 'Texas Fig, Inc.', in which the said W. T. Eldridge was substantially interested, such employment to be performed by the plaintiff under and in fulfillment of a contract between the said W. T. Eldridge and the said Texas Fig, Inc., for which services the said W. T. Eldridge agreed to pay plaintiff the salary of $700.00 per month, in accordance with the terms and provisions of Section 4 of the contract between the plaintiff and the said W. T. Eldridge. Plaintiff, however, breached the condition of the guaranty plead by him herein and declined and refused to accept the employment and declined to devote his time and services for the benefit of the said W. T. Eldridge as the said W. T. Eldridge requested and directed. Plaintiff, therefore, having breached and refused to perform the contract under which the guaranty was given to him by the said W. T. Eldridge forfeited and terminated all right to claim payment thereunder."

Defendant Nueces Lands Irrigation Company not being a party to this appeal, it is sufficient to state that it pleaded in substance the same facts alleged by appellant.

In his replication to the answers of the defendants, Bauereisen admitted having elected to claim under section IV of the Eldridge contract and denied Eldridge ever offered him any employment, but merely sought to induce Texas Fig, Inc., to employ him as a fig salesman in Oklahoma; that he was not a fig or produce salesman; that he was a mechanical engineer, and had worked at his profession all his life; that Eldridge knew these facts and knew that he was unsuited for a salesman of figs or any products sold by Sugarland Industries or Texas Fig, Inc., and that said offer of employment was not made by Eldridge in good faith, but was unreasonably and fraudulently made for the purpose of giving him a pretext for denying his liability to Bauereisen.

Both defendants specifically excepted to the allegations in Bauereisen's first supplemental petition to the effect that he was not a fig or produce salesman, but was a mechanical engineer, etc., because the contract between Bauereisen and Eldridge provided Bauereisen should devote his time and services somewhere in the United States for the benefit of Eldridge as said Eldridge might direct, and the qualifications, training and profession of Bauereisen were irrelevant and immaterial.

An order was entered by the court overruling the general demurrer and these exceptions, to which defendants duly excepted.

At the conclusion of the case, there having been no request for findings of fact or law, the court rendered judgment in favor of Bauereisen and against appellant for the sum of $40,000, and against Bauereisen on his claim against the irrigation company.

Bauereisen did not perfect his appeal from that part of the trial court's judgment denying him any recovery against the irrigation company, hence it remains undisturbed as entered below.

█ Since the two contracts declared upon are inseparable parts of the same transaction, they should be construed together, but, further, since they have been well summarized generally in the quoted statement, together with an in his verbis copy of section IV of the Bauereisen-Eldridge contract, they will not be herein copied in full, although copies are hereto attached as exhibits.

Appellant ably inveighs here against the trial court's judgment, in substance, upon these main contentions:

(1) Its general demurrer to the appellee's attempt to plead a cause of action against it should have been sustained, because the respective averments of his trial petitions, that is, his first amended and his supplemental, contain structurally inconsistent allegations that mutually destroyed each other, in that by the amended one he alleged the continued binding subsistence of the Irrigation Company's employment contract, his own readiness at all times to comply with it, its breach by the company, and Eldridge's failure upon his part to perform it; whereas, in his

supplemental one, by way of reply to appellant's answers, he alleged the happening of the contingency contemplated by section IV of the Bauereisen-Eldridge contract, adding that upon such occurrence he had elected to claim under that clause of that contract, that is, to enter a new employment for Eldridge's benefit and to receive his salary direct from Eldridge, and that Eldridge had violated that contract of absolute guaranty with him.

(2) That, on the undisputed evidence, inclusive of the two contracts declared upon, the court should have rendered judgment in its favor and against the appellee, because it was undisputedly developed that, pursuant to the above-described terms of the Irrigation Company's contract, which were clear, complete, and unambiguous, with no claim of fraud, accident, or mistake in the making thereof, prior to the expiration of the specified five years' time, Eldridge did sell his stock and liens against the Irrigation Company; that he promptly notified Bauereisen of such sale; that Bauereisen elected to receive the salary of $700 per month; that Eldridge thereupon tendered Bauereisen lawful and proper employment in the state of Oklahoma, for which he agreed to pay Bauereisen $700 per month; that Bauereisen refused to accept such employment or to devote his time and services for Eldridge's benefit, unless Eldridge gave him employment as an engineer; that the employment so tendered Bauereisen was reasonably within the contemplation of the parties at the time the Bauereisen-Eldridge agreement was made; that Bauereisen was informed and knew at and before the time the Bauereisen-Eldridge agreement was executed that Eldridge was under the impression that in the event Bauereisen elected to receive the salary of $700 per month thereunder, Eldridge could require him (Bauereisen) "to work anywhere and and do anything Mr. Eldridge tells you to do," and that Bauereisen expressed himself as, "I don't care what I do, I want my salary."

(3) That the court erred in admitting in evidence any of the telegrams and letters which passed between Bauereisen and Eldridge before the execution of the contract between those two, because all such negotiations and communications between the parties became merged in that written contract between them, which was clear on its face and not claimed to have been tainted by fraud, accident, or mistake, in the execution thereof, hence it could neither be added to, varied, nor displaced, under the rule against parol evidence.

(4) Especially was the admission of any part of Bauereisen's letter to Eldridge of June 17, 1929, inadmissible, except Bauereisen's therein announced declination to accept the position theretofore tendered him by Eldridge, because (1) the letter otherwise merely constituted Bauereisen's conclusion and construction of the contract between himself and Eldridge, which on its face was clear, certain, and complete; (2) it constituted self-serving declarations by Bauereisen in his own favor.

(5) There was a complete variance between the pleadings and the proof offered by the appellee, in that he pleaded a case under section II of his stated contract with Eldridge, which is one of absolute guaranty by Eldridge of the salary provisions of Bauereisen's contract with the Irrigation Company, whereas by his proof he negatived the existence of facts necessary to support liability under the contract of absolute guaranty he had thus pleaded.

 In the state of the record, it is determined that none of these presentments should be sustained; the gravamen of the argument for the general demurrer is that the appellee, while in his amended petition declaring upon the Irrigation Company's contract to pay him the $700 per month and upon Eldridge's guaranty thereof by the recitation in section II of of the Eldridge-Bauereisen contract, "First party hereby guarantees the payment of the salary agreed to be paid to second party by Nueces Lands Irrigation Company in said contract," in his supplemental petition, in reply to appellant's answers, he alleges Eldridge's sale of his interests in the Irrigation Company, with notice thereof to himself; that upon such notice he had elected to receive direct from Eldridge such salary for the remainder of the five-year term, declaring himself entitled to it from that source accordingly, and thereby setting up a wholly inconsistent claim with the one that he was entitled to it under Eldridge's mere guaranty of the Irrigation Company's obligation to pay it to him.

This position is thought to be inept, it going to the form rather than the substance of the appellee's pleadings considered as a whole, which ordinarily is reachable by

special exception rather than general demurrer; it is true that at first blush it might appear that appellee was declaring upon the obligation of the Irrigation Company as a still subsisting one to pay him the specified salary (and as such guaranteed by Eldridge), but, when it is ·further considered that in all of his petitions he had not only sued upon these two contracts by himself (the one with the Irrigation Company and the other with Eldridge individually) and had made them parts thereof by attaching copies of them as exhibits, but he had also therein affirmatively declared that none of such contractors had ever paid him the $700 he therein prayed for from each and all of them; not only so, but further, in its answer to his amended petition, the appellant itself had set up section IV of the Eldridge contract that appellee had not in his amended petition specifically isolated and declared upon by himself, whereupon the appellee, in what is here regarded as a timely and appropriate response to this matter as so set up in appellant's answers, himself therein declared that the contingencies specified in such section IV had occurred and that he had duly elected to claim thereunder, but that such provisions had all been breached by Eldridge, in consequence of which the latter had become directly obligated to him thereon, the learned trial court was justified—in the absence of any objection or exception at the time that such supplement contained matter proper only by way of amendment—in construing the two pleadings of the appellee together as amounting to an abandonment by him of his declaration in the first one of Eldridge's liability to him under paragraph II of their contract, and as finally intending to assert a cause of action against him (that is, his executor, the appellant) under paragraph IV of that contract; indeed, it would seem to this court in the particular circumstances that such conclusion is nothing more than a reasonable intendment of the two pleadings taken together, bridged in between as they were by appellant's introducing by itself paragraph IV under averments to the effect that appellee had become confined to the rights, if any ·belonging to him, under that section; by the order of the court referred to in the introductory statement, both of these pleadings had remained before the court until the final judgment was rendered, hence they should be considered together in determining whether or not the general

demurrer was good, Glenn **v.** Dallas County, etc., Levee Dist., 114 Tex. 325, 268 S.W. 452, 453; it might be conceded that, had there been at the trial a motion to strike or special exception to this alleged inconsistency between the two pleadings, the trial court would have required the appellee to be more specific, Central Power & Light Co. v. Johnston (Tex.Civ.App.) 24 S.W.(2d) 762; Burger v. Ray (Tex.Civ. App.) 239 S.W. 257, 260; J. I. Case T. M. Co. v. First National Bank (Tex.Civ.App.) 160 S.W. 662; 33 Texas Jurisprudence, p. 608 et seq., Pleadings, § 163, and the authorities there cited; but, in the absence of anything of that sort, it is thought that, within the rationale of the rule stated by the Commission of Appeals in the Glenn Case, supra, the supplemental petition here should be considered "for all that it means instead of what it is called" in aid of the amended petition to the extent of finally declaring the liability claimed to have accrued under section IV of the contract alone; upon what appears to have been the legal equivalent of the same situation as obtains here the Beaumont Court of Civil Appeals so held in Beaumont Irrigating Co. v. Gregory, 136 S.W. 545. See, also, Hubb Diggs Co. v. Ft. Worth State Bank, 117 Tex. 107, 298 S.W. 419; Kelly v. Gross (Tex.Civ.App.) 4 S.W.(2d) 296.

Neither the case of Dallas, etc., R. Co. v. Redman (Tex.Civ.App.) 88 S.W.(2d) 136, nor the text of 33 Texas Jurisprudence, § 65, p. 489, both so strongly relied upon by appellant in this connection, are thought to have been grounded upon essentially the same state of facts, in that here there was no actual repugnance between positions finally insisted upon, but a mere change from one to the other through which this appellee at last abandoned any cause of action he might have had upon the guaranty provisions of his contract with Eldridge, and relied only in the end upon his sole right to the salary as given in paragraph IV of that same contract.

■ The vice in the second contention that, under the undisputed evidence, judgment should have been rendered in appellant's favor, seems to this court to lie in a begging of any question about that by appellant's assuming as a predicate therefor that Eldridge's tender to Bauereisen of employment by another corporation of a position as a fig-salesman in Oklahoma was a full compliance with his obligation under section IV of their contract as being not

only a "lawful and proper employment, but one reasonably within the contemplation of the parties at the time the Bauereisen-Eldridge agreement had been made"; it would certainly seem inept to contend that, with the two contracts sued on not considered, or construed differently from this quoted view of their meaning, the undisputed evidence yet required a judgment for the appellant; indeed, since these two contracts, together with the stated actions of the parties that occurred pursuant to them, constituted the major part of all the evidence, it clearly follows that these propositions cannot be sound if the contracts were susceptible of at least the construction that they are not on the face thereof reasonably within the contemplation of the parties at the time they were made; in other words, it is the view of this court that, when the relations, surroundings, and mutual knowledge of the parties with reference thereto, as well as of the conditions appertaining to what they were undertaking to do, are considered, the two writings between them were susceptible of the interpretation that they meant the time and services of Bauereisen somewhere in the United States to be reasonably in line with what they both well knew he had been then specially fitted for—that is, the work of a mechanical engineer whose main occupation was that of a driller of water wells with a rig of his own; that being so, there was ample evidence aliunde the terms of the two contracts for the support of the presumed finding by the trial court that this fig sales job offered Bauereisen by Eldridge was not a reasonable employment under the terms of their contract; in short, to repeat somewhat, they were father-in-law and son-in-law, they both then knew that Bauereisen was such an engineer, fitted only for mechanical pursuits by both education and temperament, that he had never had any experience anywhere as a fig or other crop salesman, and was not by nature cut out for that kind of employment; under that interpretation of their agreement, it follows as the night the day that Bauereisen's undisputed refusal to accept employment as a fig salesman alone did not require the rendition of a· judgment adverse to him.

■ From what has just been said it further follows—if the construction therein given of the contract be permissible— that the question of whether or not Bauer-

eisen was justified in so refusing to accept the tender of employment as a fig salesman is one of fact rather than of law, depending upon whether or not that service so demanded of him was a reasonable one in the particular circumstances attending. Development Co. v. King (C.C.A.) 161 F. 91, 24 L.R.A.(N.S.) 812; Meyerson v. Hart (C.C.A.) 167 F. 965, 967; Price v. Mouat, 11 C.B.(N.S.) 508, 148 Eng.Rep., 895.

■ Upon like or kindred considerations, it is thought the admission of the complained of letter from Bauereisen to Eldridge of June 17, 1929, was not erroneous for any of the reasons appellant advances; if the contract was subject to the interpretation just indicated, rather than that Bauereisen was under its express terms (claimed by appellant to be "clear, complete, and unambiguous") bound to accept any and every sort of employment offered to him by Eldridge "anywhere in the United States" that was tendered as being for Eldridge's benefit, or forfeit forthwith any and all rights he might have under it—as appellant upon that as a basis further apparently contends—then this letter did not contravene the well-settled rules of evidence appellant invokes against it, but was offered solely for the purpose of showing the attending circumstances at the time and consequently what the parties meant by the language employed in their contract, consonant with the rules stated in 10 Texas Jurisprudence, § 169; in this connection it will be noted that this section IV neither defined nor specified the kind of services Bauereisen was to render merely prescribing the territorial locus of them as to be "somewhere in the United States"; wherefore, the evidence so objected to in this instance was applicable to these facts and admissible under the rule thus stated in Labatt on Master & Servant, vol. 1, p. 884, par. 288:

"Parol evidence is not admissible to show the sense in which the parties used the words of a written contract which defined the scope of the servant's obligation in respect to work done by him. But where such a contract does not state precisely in what capacity the services are to be rendered, parol evidence is admissible to show that the duties which the servant was engaged to discharge were or were not of such a character that he was or was not justified in refusing to perform the

services in question. Such evidence is explanatory of, and consistent with, the written contract, and is not objectionable as adding to its terms."

The final insistence for a variance between the appellee's pleadings and his proof has in effect been answered by the conclusions stated on the other distinctive features of the cause, which, it is thought, undermine this last one also; if, as has been determined, the appellee's pleadings did not so confine the legal limit of his declared upon cause of action to one for the violation of the claimed absolute guaranty under section II of the Eldridge-Bauereisen contract, then the rationale of this position is destroyed along with that urging such resulting effect from the appellee's two pleadings.

█ Indeed, upon the cause as a whole, under the views already stated, it is the opinion of this court that, there being no prejudicial errors in other respects assigned, the correctness of the learned trial court's judgment herein depended upon whether or not it was justified in presumably finding as a fact that Eldridge's attempt to comply with his stated obligation by directing Bauereisen to assume the duties of a traveling fig salesman, under all the attending circumstances, was either so unreasonable or in such bad faith as justified Bauereisen in declining it on the ground that it was a breach of their contract; after reviewing the statement of facts with special reference to that issue, it is concluded that the evidence was sufficient to support, if indeed it did not require, the learned trial court to make such a finding, and in either event it will be presumed that it was made; it would serve no useful purpose to here make a résumé of all the evidence heard upon that question, hence it will not be undertaken.

Pursuant to the conclusion that no reversible error has been pointed out, the judgment will be affirmed.

Affirmed, with Justice LANE dissenting.

LANE, Justice (dissenting).

Nueces Land Irrigation Company, a Texas corporation, was the owner of several hundred acres of land in Dimmit county, Tex., which it contemplated improving under an irrigation system. W. T. Eldridge was the owner of a large in-terest in the properties of said corporation and he also held a deed of trust or mortgage lien against said properties to secure the payment of a large indebtedness due him by the corporation.

It was the purpose of the corporation to put its lands under an irrigation system, put it or a part of it into a state of cultivation, to erect buildings thereon, to subdivide it into several tracts, and to offer said tracts for sale, and to accomplish its purposes it sought the services of R. J. Bauereisen, son-in-law of W. T. Eldridge, who resided in Chicago, as general manager of its properties and as such manager to put down wells for obtaining water for irrigation purposes, to have constructed canals, and to perform such other duties as were necessary to accomplish its purposes, and to negotiate sales of its lands.

Bauereisen had educated himself as a mechanical engineer and entered the same as his profession and had equipped himself with tools and implements to carry on his profession.

W. T. Eldridge, as president of Nueces Land Irrigation Corporation and as one owning a large interest therein, began negotiations with Bauereisen to procure his services as general manager of the properties of Nueces Corporation, Whereupon Bauereisen came to Texas, looked over the premises and after doing so entered into two written contracts contemporaneously made, one with the Nueces Corporation and the other with W. T. Eldridge, both dated the 26th day of July, 1928, the first being executed only upon condition that the second would be executed. The contracts mentioned are as follows:

First contract:

"This Agreement entered into this 26th day of July, 1928, by and between Nueces Lands Irrigation Company, a corporation organized under the laws of the State of Texas, with its principal office in Sugar Land, Fort Bend County, Texas, hereinafter called Company, and R. J. Bauereisen, hereinafter called Second Party, Witnesseth:

"I. The Company agrees to employ Second Party as its General Manager for a period of five (5) years, beginning September 1st, 1928, and to pay Second Party a salary of Seven Hundred Dollars ($700) per month, and to provide Second Party with a house suitable for the occupancy

of Second Party and his family on the Company's properties in Dimmit County, Texas.

"II. Second party hereby accepts said employment and agrees to devote his best efforts and entire time to the management of the affairs of the Company, it being contemplated, however, that Company will permit Second Party to contract for the drilling of wells or other work in Texas, provided such contracts can be and are made and performed without in anyway causing Second Party to neglect his duties as General Manager of the Company. Second Party agrees that he will not contract or undertake any such work without first receiving the express written consent of the Company throught its President.

"III. Second Party, being the owner of one drilling rig and cable tools, hereby agrees to move same to the property of the Company in Dimmit County, Texas, and to use same in the drilling of wells and in connection with other well work on said property, in accordance with the Company's best interests, the Company to pay all costs of such drilling and such work, and in addition thereto Company to pay Second Party at the rate of 60¢ per foot for each foot drilled by said rig and tools, and at the rate of $10.00 per day for rig work other than drilling, it being estimated that such payments will compensate Second Party for the repairs, replacements and depreciation on said rig and tools. Company also agrees to pay the freight and other costs of transporting said rig and tools from present location to said property in Dimmit County, Texas.

"IV. The Company agrees to reimburse Second Party for the expense (exclusive of damage) of moving Second Party's household belongings and office furniture and equipment from Chicago to Company's property in Dimmit County, Texas.

"In Testimony Whereof parties hereunto sign their names on the day and year first above written.

"Nueces Lands Irrigation Company
"By: [Signed] W. T. Eldridge,
President.
"Attest:
"[Signed] H. E. Thompson,
"Secretary [Seal]."

Second contract:

"This Agreement entered into this 26th day of July, 1928, by and between W. T. Eldridge, hereinafter called First Party, and R. J. Bauereisen, hereinafter called Second Party, Witnesseth:

"I. As a special inducement to cause Second Party to enter into a contract with Nueces Lands Irrigation Company to act as General Manager of said Company, for a period of five years, first party hereby agrees to give second party one-half (½) of all the dividends which may be declared within the next five (5) years upon the stock in said Company which now belongs to first party, or which may be acquired by first party within the five (5) year period.

"II. First party hereby guarantees the payment of the salary agreed to be paid to second party by Nueces Lands Irrigation Company in said contract.

"III. In the event that within said (5) five year period first party should foreclose the liens which he now holds against the properties of Nueces Lands Irrigation Company, first party agrees that he will enter into a contract with second party, in which the spirit of said contract between Nueces Lands Irrigation Company and second party will be carried out for the remaining portion of said five (5) year period, and in which first party will agree to divide equally with second party the net profits realized from the operation and/or sale of said properties prior to the expiration of the five (5) year period above mentioned, and it being understood that in such event first party shall receive his entire investment plus six per cent (6%) interest before any profit can be considered to have been earned.

"IV. In the event that first party should sell or assign his stock and liens in and against said Company prior to the expiration of the five (5) year period, or in the event said Company should sell or assign within said period all its properties to any party other than first party, second party shall have the election of receiving from first party the salary for the remaining portion of said five (5) year period at the rate of Seven Hundred Dollars ($700.00) per month, or of receiving one-half (½) of the profit realized by first party on the transaction, first party receiving his entire investment plus 6% interest before any profit shall be considered to have been earned. Second party's right to receive the salary for the remaining portion of said period upon his electing to do so upon the happening of either of the above contingencies, shall

be conditional upon his devoting his time and services somewhere in the United States for the benefit of first party, as the first party may direct.

"V. Second party hereby agrees that first party shall receive one-half (½) of all the net profits realized during said five (5) year period by second party from any and all of his operations in connection with the drilling of wells, and the sale of well equipment.

"Executed in duplicate this 26th day of July, 1928.

"[Signed] W. T. Eldridge,
"First Party,
"[Signed] R. J. Bauereisen,
"Second Party."

After the execution of the contracts, R. J. Bauereisen moved upon the premises of the Nueces Corporation and actively entered upon the performance of his duties as general manager of said properties and premises according to the terms of said contracts, and continued to do so until the 17th day of April, 1929, and would have continued to perform such duties for the full five-year term stipulated in the first contract but for the fact that the corporation failed to further perform its part of the five-year contract. The corporation paid Bauereisen for the time he served it as general manager and refused to pay him the stipulated $700 per month for the remainder of the five-year period stated in the first contract.

On or before the 19th day of April, 1929, W. T. Eldridge disposed of all of his interest whatsoever in the properties of the Nueces Corporation at a large loss. Immediately after such disposition was made by W. T. Eldridge he informed Bauereisen thereof, and upon the receipt of such information Bauereisen elected to become an employee of Eldridge under the terms of the second contract at a salary of $700 per month, as is in said contract provided. Upon such election by Bauereisen, Eldridge directed him to engage in the sale of certain products of the Texas Fig Corporation in certain territory in the state of Oklahoma. Mr. Eldridge was, at such time, heavily financially interested in the fig preserving plant and it was understood by both Eldridge and Bauereisen that the work offered was for the benefit of Eldridge, for which Eldridge had obligated himself to pay Bauereisen the sum of $700 per month.

The Texas Fig Corporation was actively engaged in preparing figs for the market and selling them throughout the United States, it having operated nine fig plants in Texas in 1928 and packed approximately $1,115,000 worth of figs in that year. From June, 1928, to March 16, 1929, the fig company had a general sales agency contract with George Nolan Corporation of New York, under which that corporation was made general sales agent for the fig company for the entire United States. The contract with the Nolan Corporation having terminated, the fig company desired to place its own representative in the Oklahoma territory. Bauereisen refused to serve as such salesman, upon his contention that such work was a departure from the line of work he had educated himself to perform, and a departure from his profession as a mechanical engineer, and that the demand of Eldridge that he should perform such work was unreasonable and not embraced within the terms of the contract he had with Eldridge. Upon the refusal of Bauereisen to perform the work tendered, Eldridge refused to pay him the monthly salary stipulated in the Eldridge-Bauereisen contract, and no further payments were paid by reason thereof.

W. T. Eldridge died on the 20th day of August, 1932, leaving a last will which was duly probated. By the provisions of such will the Guardian Trust Company, a corporation, was named as independent executor of the will of the deceased, W. T. Eldridge, and it duly qualified as such executor.

On the 17th day of April, 1933, R. J. Bauereisen brought this suit against Nueces Land Irrigation Company, a corporation, and Guardian Trust Company. Later, on the 9th day of November, 1934, he filed his first amended original petition, in lieu of his original petition, complaining of the same parties named as defendants in his original petition. The plaintiff declared upon the two contracts hereinbefore set out only, which he made exhibits to his petition.

He alleged that after the contracts were executed he entered upon the performance of his contract with the Irrigation Company and continued in its employ until April 19, 1929, and would have continued performance for the full five-year term thereof, but the company refused to perform the contract after said date and to pay him the stipulated salary of $700 per

month, except that by an agreement made in December, 1929, a certain sum of money was accepted by him in satisfaction of his claims which had accrued prior to June 1, 1929, without prejudice to any claims arising after that date; and the company also required him to vacate the house which he occupied on its premises and thereby compelled him to secure another at a cost of $100 per month during the remainder of the contract term. Bauereisen further alleged in substance that he had at all times been willing and ready to perform the contract with the Irrigation Company; that during the period since the contract had been breached he had been able to earn not to exceed $6,500; that thereby the Irrigation Company had damaged him to the extent of $40,000; that W. T. Eldridge was liable to him as guarantor of the salary agreed to be paid him by the Irrigation Company, and that he having died August 20, 1932, and Guardian Trust Company having been appointed and qualified as independent executor under his will, it was liable to him in such capacity.

In its first amended original answer, Guardian Trust Company, as independent executor under the will of W. T. Eldridge, deceased, appellant herein, interposed a general demurrer and general denial to the aforementioned petition and alleged that on April 1, 1929, W. T. Eldridge sold to the Sugarland Industries all his stock in and notes and liens against the Irrigation Company, and promptly thereafter notified Bauereisen of such sale; that, following such notice, Bauereisen, pursuant to section IV of the contract, elected to receive from Eldridge the salary for the remaining portion of said five-year period at the rate of $700 per month; that Eldridge arranged for Bauereisen to be employed in the state of Oklahoma by a corporation known as "Texas Fig, Inc.," in which Eldridge was substantially interested, such employment to be performed by Bauereisen in fulfillment of a contract between Eldridge and said Texas Fig, Inc., for which services Eldridge agreed to pay Bauereisen $700 per month, in accordance with the provisions of section IV of the aforementioned contract between Bauereisen and Eldridge; that Bauereisen having elected to claim under section IV of the contract, and having declined and refused to accept such employment and declined to devote his time and services for the benefit of Eldridge as he directed, and that Bauereisen having so breached his contract with Eldridge, he thereby forfeited and terminated all right to claim payment thereunder.

Defendant Nueces Lands Irrigation Company not being a party to this appeal, it is sufficient to state that it pleaded in substance the same facts alleged by appellant.

In his replication to the answers of the defendants, Bauereisen admitted having elected to claim under section IV of the Eldridge contract and denied Eldridge ever offered him any employment, but merely sought to induce Texas Fig, Inc., to employ him as a fig salesman in Oklahoma; that he was not a fig or produce salesman; that he was a mechanical engineer, and had worked at his profession all his life; that Eldridge knew these facts and knew that he was unsuited for a salesman of figs or any products sold by Sugarland Industries or Texas Fig, Inc.; and that said offer of employment was not made by Eldridge in good faith.

Both defendants specifically excepted to the allegations in Bauereisen's first supplemental petition to the effect that he was not a fig or produce salesman, but was a mechanical engineer, etc., because the contract between Bauereisen and Eldridge provided Bauereisen should devote his time and services somewhere in the United States for the benefit of Eldridge as said Eldridge might direct, and the qualifications, training, and profession of Bauereisen were irrelevant and immaterial.

An order was entered by the court overruling the general demurrer and these exceptions, to which defendants duly excepted.

At the conclusion of the evidence and argument of counsel, the trial judge, before whom the case was tried without a jury, rendered judgment in favor of R. J. Bauereisen against Guardian Trust Company, executor, for the sum of $40,000, and against Bauereisen on his claim against the Nueces Corporation. From such judgment the Guardian Trust Company, executor, has appealed.

There being no appeal from the judgment for Nueces Lands Irrigation Company against Bauereisen, our further observations and discussions will be confined to the controversy and issues presented by this appeal between appellant, Guardian Trust Company, executor of the will of W. T. Eldridge, deceased, and appellee, Bauereisen, only.

The majority of this court holds that all assignments of error interposed by appellant should be overruled, and so holding have entered an order affirming the judgment of the trial court. From such order I respectfully enter my dissent, believing, as I do, that the judgment of the trial court is not supported by any evidence, but is contrary to the undisputed evidence.

While I am of opinion that some of the assignments of error urged by appellant should be sustained, the sustaining of which would demand a reversal of the judgment, unless the judgment should be reversed and judgment here rendered for appellant on the undisputed evidence, I will not discuss any of the assignments other than the one insisting that the trial court erred in not rendering judgment for appellant upon the evidence, as requested by appellant.

Plaintiff, Bauereisen, after fully informing himself as to the duties to be imposed upon him should he enter into the contract to become general manager of the properties of the Irrigation Company, entered into the two contracts, which he admits would require him to superintend and control the putting into cultivation the land of the company, the building of houses, the purchase of supplies for a commissary, and tools and implements for the work to be done on the farm, the subdivision of the land, the negotiation for the sale of such subdivisions, and all other acts necessary to make a success of his management of the enterprise, among other things to superintend the planting of carrots, white cabbage, red cabbage, and broccoli, and to sell the same.

It is shown by the undisputed evidence that in the early part of the year 1928, W. T. Eldridge, desiring to procure the services of some one to take charge of the properties of the Nueces Corporation as its general manager, and knowing the general intelligence and business ability of R. J. Bauereisen, who was his son-in-law, began negotiations with him with a view to procuring his services as the general manager of such properties. It is shown by the undisputed evidence that Bauereisen knew before he executed the contracts what manner of work he would be required to perform under their terms, if he executed them; that on July 3, 1928, 23 days before the contracts were executed, and while the negotiations were going on, Bauereisen wrote Eldridge a letter in which he said: "As I explained I will want to have complete charge of the project in its entirety and I will spare no effort to make it a success. * * * I am no farmer but will learn that end of it."

And in his letter of July 12, 1928, to Eldridge, he said: "I am sure I can save the Company many times my salary and that I can successfully operate and gradually dispose of the property, otherwise I would not think of making a change. The work should prove extremely interesting for us both."

The plaintiff, Bauereisen, testified that before signing the contracts he went out and looked over the properties of the Nueces Corporation in Dimmit county, Tex., and discussed with Mr. Curtis and other men residing on the property just what the company was doing, and made a survey of the property; that he knew what the property was held for; that he knew that it was held for the purpose of colonization and a part of such purpose was the carrying on of farming operations; that by the term colonization he meant subdividing the land and selling such subdivisions to persons who could be interested in locating thereon; that he knew that it would be a part of his duties under the terms and conditions of the contracts to carry out the plan or purpose mentioned; that as general manager he knew what his duties were, and knew that he was in charge of the properties in question, which included the development thereof for growing crops, the subdivision of the land, the supervision of the sale of such subdivisions, and that he had the general responsibility for the operation and success or failure of the enterprise, and that he intended to go there (on the farm) and do everything necessary to put the enterprise over, and if that involved the selling of the land, the growing of crops, and the selling of such crops, he was to employ people to carry out such acts, for whose acts he was responsible, which amounted to doing such acts himself; that he was going to learn such duties as he assumed under the terms of the contracts that he did not already know; that all such duties assumed were in nowise connected with engineering, but he was going to learn to do them to the best of his ability; that at the time he executed the contracts and entered upon the performance of his duties thereunder *he knew that he was going out*

*of his previous line of employment into new fields,* and that he would have more than those duties to perform.

Testifying further, Bauereisen said that he went over to Nueces Corporation's properties in Dimmit county and looked over the job to see what should be and could be done, getting familiar with his work. Being asked to tell the court the general character of labors and duties he was called upon to perform as general manager, he stated that among other things that there were 8,500 acres in the Nueces Company's lands. Being asked what work he did under the contracts, he said, "Well, I just had general supervision of all the work there." Testifying further, he said that one of his duties was to put in a crop on the land; that to do so he had to do some clearing, grading, and plowing; that he had to buy for the commissary, to buy implements and tools to till the soil; that it was required of him to pay off the laborers, to keep time, to keep books, and to keep track of all the accounts. Being asked what he was to grow on the farm, he said that they were going to grow everything that they possibly could, principally spinach, onions, carrots, beets, broccoli, beans, and cabbage, red and white cabbage; that they had about 350 or 400 acres planted in these various crops; that they had about 150 acres planted in spinach; that he continued to perform the duties enumerated about 7 months, up to April 1, 1929; on or about said date W. T. Eldridge came to the ranch and said he had sold his interest in the properties and did not know that he (Bauereisen) would be retained as general manager, but, if he was not so retained, he would of course live up to his part of the contract and see that Bauereisen got his $700 per month salary; that thereafter the Sugarland Industries, the purchaser of the interest of Eldridge, took charge of the properties and paid him his salary up to May 1, 1929, and no more; that he received nothing further from either of the contracts.

On April 22, 1929, W. T. Eldridge wrote Bauereisen stating he had been informed that his employment with the Irrigation Company would terminate on May 1, 1929, and, continuing, he stated as follows:

"In view of this situation, I assume that you will look to me under our contract dated July 26th, 1928. As you know, of course, I have sold all my Nueces stock and liens to the Sugarland Industries, and therefore section 4 of our contract is applicable, and you have an option to exercise. If there is any doubt in your mind about what your choice should be, I shall be glad to hear from you, and I should like for you to make your decision and let me know as early as practicable, in order that I can be looking around for the purpose of seeing what I can find for you to do in case you should elect to retain your salary contract.

"I am leaving Saturday for Atlanta, and will be gone several days, and I would like to hear from you about the above before leaving, if possible."

On April 24th, Bauereisen in reply wrote Eldridge as follows:

"Yours of the 22nd reached me yesterday, and you realize, of course, that I want to do what is best for Ivy, myself and you, and if it is better for us to take the one-half (½) profit realized in the transaction, perhaps we should do so rather than the salary of Seven Hundred ($700.00) Dollars per month.

"Won't you please send me a statement of the transaction showing the profits so that we may decide whether to accept one-half (½) of the profits or the Seven Hundred ($700.00) Dollars monthly salary."

On May 1, 1929, Eldridge in reply wrote Bauereisen, as follows:

"The Sugarland Industries paid me $85,816.27 for my Nueces Lands Irrigation Co. stock and notes and liens, and also assumed the Cunningham first lien note with interest amounting to $65,837.60, making the total consideration $151,653.87. The transfer was made April 1st, and at that time my investment in the Nueces proposition was in the neighborhood of $500,000.00. Because of the absence of Mr. Ellington and his records, I am unable to give you an accurate statement of the extent of my investment at this moment, but will do so if you desire it as soon as Ellington completes his work at the ranch. I can assure you that the amount is far in excess of the consideration which I have received from the Sugarland Industries, and that I have realized no profit whatever on the transaction.

"I intend to be in San Antonio some time in the near future, at which time I shall be glad to talk to you about working for me in some new capacity, if you wish to do so, and in case you do I shall try to

find something for which you can do and which will be dignified. I shall give you as much notice in advance as possible as to when I will be in San Antonio, and I trust it will be convenient for you to meet me there."

The undisputed evidence shows that Eldridge, under the terms of the Eldridge-Bauereisen contract, offered Bauereisen employment as district salesman of the products of a corporation known as Texas Fig, Inc., in the state of Oklahoma, at a salary of $700 per month, and that Bauereisen refused such employment, insisting that he was not a salesman and that such employment was out of line with his profession as an engineer.

The fourth paragraph of the Eldridge-Bauereisen contract is as follows: "In the event that first party should sell or assign his stock and liens in and against said Company prior to the expiration of the five (5) year period, or in the event said Company shall sell or assign within said period all its properties to any party other than first party, second party shall have the election of receiving from first party the salary for the remaining portion of said five (5) year period at the rate of Seven Hundred Dollars ($700.00) per month, or of receiving one-half (½) of the profit realized by first party on the transaction, first party receiving his entire investment plus 6% interest before any profit shall be considered to have been earned. Second party's right to receive the salary for the remaining portion of said period upon his electing to do so upon the happening of either of the above contingencies shall be conditional upon his devoting his time and service somewhere in the United States for the benefit of the first party, as first party may direct."

As already shown, Texas Fig, Inc., was actively engaged in preserving figs for the market and selling them throughout the United States, it having operated nine fig plants in Texas in 1928 and packed approximately $1,115,000 worth of figs in that year. From June, 1928, to March 16, 1929, the Fig Company had a general sales agency contract with George Nolan Corporation of New York, under which that corporation was made general sales agent for the Fig Company for the entire United States. The contract with the Nolan Corporation having terminated, the Fig Company desired to place its own representative in the Oklahoma territory.

There is nothing in either of the contracts, nor in both combined, to authorize Bauereisen to conclude he was to be furnished by Eldridge an engineer's job, but, to the contrary, the nature of the work he contracted to do, and which he did do under the contract, refutes such conclusion. There was nothing from which the trial court, nor this court, could reasonably base a conclusion that the employment offered Bauereisen under the terms of the fourth clause of the Eldridge-Bauereisen contract was undignified or unreasonable.

Notwithstanding Bauereisen admits he contracted to superintend and control the doing of things required of a general manager of the properties, among which was the growing of *spinach, carrots, beans, red cabbage, and white cabbage,* he now contends that to require him under the contract to undertake the sale of the products of a large industry was unreasonable.

The contracts are unambiguous and there is nothing in either of them that could be interpreted as providing an engineer's job for Bauereisen under the Eldridge-Bauereisen contract.

I think the facts stated demanded at the hands of the trial court a rendition of a judgment for the defendant, independent executor, and that it is the duty of this court, upon such facts, to reverse the judgment of the trial court and to here render judgment for appellant, and, so believing, I respectfully dissent from the order of affirmance entered by the majority of this court.

### Exhibit A.

"This agreement entered into this 26th day of July, 1928, by and between Nueces Lands Irrigation Company, a corporation, organized under the laws of the State of Texas, with its principal office in Sugar Land, Fort Bend County, Texas, hereinafter called Company, and R. J. Bauereisen, hereinafter called Second Party, Witnesseth:

"I. The Company agrees to employ Second Party as its General Manager for a period of five (5) years, beginning September 1st, 1928, and to pay Second Party a salary of Seven Hundred Dollars ($700.) per month, and to provide Second Party with a house suitable for the occupancy of Second Party and his family on the Company's properties in Dimmit County, Texas.

"II. Second Party hereby accepts said employment and agrees to devote his best efforts and entire time to the management of the affairs of the Company, it being contemplated, however, that Company will permit Second Party to contract for the drilling of wells or other work in Texas, provided such contracts can be and are made and performed without in any way causing Second Party to neglect his duties as General Manager of the Company. Second Party agrees that he will not contract or undertake any such work without first receiving the express written consent of the Company through its President.

"III. Second Party, being the owner of one drilling rig and cable tools, hereby agrees to move same to the property of the Company, in Dimmit County, Texas, and to use the same in the drilling of wells and in connection with other well work on said property in accordance with the Company's best interests, the Company to pay all costs of such drilling and such work, and in addition thereto Company to pay Second Party at the rate of 60¢ per foot for each foot drilled by said rig and tools, and at the rate of $10.00 per day for the rig work other than drilling, it being estimated that such payments will compensate Second Party for the repairs, replacements and depreciation on said rig and tools. Company also agrees to pay the freight and other costs of transporting said rig and tools from present location to said property in Dimmit County, Texas.

"IV. The Company agrees to reimburse Second Party for the expense (exclusive of damage) of moving Second Party's household belongings and office furniture and equipment from Chicago to Company's property in Dimmit County, Texas.

"In testimony whereof, parties hereunto sign their names, on the day and year first above written.

"Nueces Lands Irrigation Company
 "By [Signed] W. T. Eldridge
 "[Signed] R. J. Bauereisen,
 "Second Party."

#### Exhibit B.

"This agreement entered into this 26th day of July, 1928, by and between W. T. Eldridge, hereinafter called First Party, and R. J. Bauereisen, hereinafter called Second Party, Witnesseth:

"I. As a special inducement to cause Second Party to enter into a contract with Nueces Lands Irrigation Company to act as General Manager of said Company for a period of five years, first party hereby agrees to give second party one-half (½) of all the dividends which may be declared within the next five (5) years from the stock in said company which not belongs to first party or which may be acquired by first party within the five (5) years period.

"II. First Party hereby guarantees the payment of the salary agreed to be paid to second party by Nueces Lands Irrigation Company in said contract.

"III. In the event that within said five (5) year period first party should foreclose the liens which he now holds against the properties of Nueces Lands Irrigation Company, first party agrees that he will enter into a contract with second party in which the spirit of said contract between Nueces Lands Irrigation Company and second party will be carried out for the remaining portion of said five (5) year period, and in which first party will agree to divide equally with second party the net profits realized from the operation and/or sale of said properties prior to the expiration of the five (5) year period above mentioned, and it being understood that in such event first party shall receive his entire investment plus six per cent (6%) interest before any profit can be considered to have been earned.

"IV. In the event that first party should sell or assign his stock and liens in and against said Company prior to the expiration of the five (5) year period, or in the event said Company should sell or assign within said period all its properties to any party other than first party, second party shall have the election of receiving from first party, the salary for the remaining portion of said five (5) year period at the rate of Seven Hundred Dollars ($700.00) per month or of receiving one-half (½) of the profit realized by first party on the transaction, first party receiving his entire investment plus 6% interest before any profit shall be considered to have been earned. Second party's right to receive his salary for the remaining portion of said period upon his electing to do so upon the happening of either of the above contingencies, shall be conditional upon his devoting his time and services somewhere in the United States for the benefit of first party as first party may direct.

"V. Second party hereby agrees that first party shall receive one-half (½) of all the net profits realized during said five

(5) year period by second party from any and all of his operations in connection with the drilling of wells, and the sale of well equipment.

"Executed in duplicate this 26th day of July, 1928.

"[Signed] W. T. Eldridge
"First Party,
"[Signed] R. J. Bauereisen
"Second Party."