GUARDIAN TRUST COMPANY, INDEPENDENT EXECUTOR, V.
R. J. BAUEREISEN.

No. 7201. Decided November 30, 1938.
Rehearing overruled February 15, 1939.
(121 S. W., 2d Series, 579.)

*Baker, Botts, Andrews & Wharton, C. R. Wharton, G. G. Gannon,* and *John T. McCullough,* all of Houston, for plaintiff in error.

When the parties to an agreement have adopted a writing

which is clear and unambiguous as the final and complete expression of the agreement, all contemporaneous oral agreements and all prior oral or written agreements relating to the same subject matter are inoperative to add to or to vary the final writing, unless fraud, accident or mistake is averred and proved. Heirs of Watrous v. McKie, 54 Texas 65; Lone Star Salt Co. v. Texas Short Line Ry. Co. 99 Texas 434, 90 S. W. 863; Reynolds v.McMan Oil & Gas Co., (Com. App.) 11 S. W. (2d) 778.

*A. D. Dyess, David T. Searls, Vinson, Elkins, Weems & Francis,* all of Houston, for defendant in error.

Allegations by plaintiff that he entered into a contract with his father-in-law Eldridge, wherein he was guaranteed the payment of a salary, to be paid by the irrigation company, or in case Eldridge sold his interest in said company, should have the election of receiving from Eldridge one-half the profits of sale or a monthly salary of $700.00, for the remaining portion of his contract of employment, and his election to accept the latter, were not inconsistent and did not nullify each other. Dallas Ry. & Ter. Co. v. Redman, 88 S. W. (2d) 136; Wright v. McCampbell & Son, 75 Texas 644, 13 S. W. 293; Thompson v. Caldwell, (Com. App.) 22 S. W. (2d) 720.

MR. JUDGE HICKMAN, of the Commission of Appeals, delivered the opinion for the Court.

As this case comes to this Court there are but two parties, R. J. Bauereisen, and Guardian Trust Company, independent executor in the will of W. T. Eldridge, deceased. Bauereisen was awarded judgment in the trial court against the executor for $40,000.00 damages for the breach of a contract executed by him and Eldridge. That judgment was affirmed by the Court of Civil Appeals, its opinion being reported in 99 S. W. (2d) 357.

Two questions are brought forward in the application for writ of error, but we have concluded that it will be necessary to consider but one of them and our statement will be limited to such facts as are thought to throw light upon that question.

W. T. Eldridge was a man of large business affairs. The details of his business interest are not fully disclosed by the record, but it appears that he was a large stockholder in a corporation known as Sugarland Industries. That corporation had subsidiaries, among them being Texas Fig, Inc., which operated nine fig plants. Most of Eldridge's business was carried

on through corporations, but he owned in his own right a majority of the stock in a corporation known as Nueces Lands Irrigation Company. He also owned some liens against the properties of that company. The Irrigation Company owned about 8500 acres of land in Dimmit County and was subdividing, improving and selling the land in small tracts. Bauereisen, who was Eldridge's son-in-law, lived in Chicago, Illinois, and was engaged in the business of drilling water wells. He had two drilling rigs used by him in his business. During the year 1928 Eldridge took up with Bauereisen the question of employing him to come to Texas and drill some wells on the lands of the Irrigation Company. After some correspondence, followed by a personal visit by Bauereisen to Texas, two contracts were executed contemporaneously and as a part of the same transaction, one with the Irrigation Company and the other with Eldridge. Since the decision of this case turns upon the construction of these contracts, they are here copied in full.

FIRST CONTRACT.

"THIS AGREEMENT entered into this 26th day of July 1928, by and between Nueces Lands Irrigation Company, a corporation organized under the laws of the State of Texas, with its principal office in Sugar Land, Fort Bend County, Texas, hereinafter called Company, and R. J. Bauereisen hereinafter called Second Party, WITNESSETH:

I.

"The Company agrees to employ Second Party as its General Manager for a period of five (5) years, beginning September 1st, 1928, and to pay Second Party a salary of Seven Hundred Dollars ($700.) per month, and to provide Second Party with a house suitable for the occupancy of Second Party and his family on the Company's properties in Dimmit County, Texas.

II.

"Second Party hereby accepts said employment and agrees to devote his best efforts and entire time to the management of the affairs of the Company, it being contemplated, however, that Company will permit Second Party to contract for the drilling of wells or other work in Texas, provided such contracts can be and are made and performed without in any way causing Second Party to neglect his duties as General Manager of the Company. Second party agrees that he will not contract or undertake any such work without first receiving the express written consent of the Company through its President.

### III.

"Second Party, being the owner of one drilling rig and cable tools, hereby agrees to move same to the property of the Company in Dimmit County, Texas, and to use same in the drilling of wells and in connection with other well work on said property, in accordance with the Company's best interests, the Company to pay all costs of such drilling and such work, and in addition thereto Company to pay Second Party at the rate of 60¢ per foot for each foot drilled by said rig and tools, and at the rate of $10.00 per day for rig work other than drilling, it being estimated that such payments will compensate Second Party for the repairs, replacements and depreciation on said rig and tools. Company also agrees to pay the freight and other costs of transporting said rig and tools from present location to said property in Dimmit County, Texas.

### IV.

"The Company agrees to reimburse Second Party for the expense (exclusive of damage) of moving Second Party's household belongings and office furniture and equipment from Chicago to Company's property in Dimmit County, Texas.

"In testimony Whereof parties hereunto sign their names on the day and year first above written.

NUECES LANDS IRRIGATION COMPANY  
By: (Signed) W. T. Eldridge,  
President.  
(Signed) R. J. Bauereisen,  
Second Party.

ATTEST:  
(Signed) H. E. Thompson,  
Secretary (Seal)"

### SECOND CONTRACT.

"THIS AGREEMENT entered into this 26th day of July 1928, by and between W. T. Eldridge, hereinafter called First Party and R. J. Bauereisen, hereinafter called Second Party, WITNESSETH:

### I.

"As a special inducement to cause Second Party to enter into a contract with Nueces Lands Irrigation Company to act as General Manager of said Company, for a period of five years, first party hereby agrees to give second party one-half (1/2) of all the dividends which may be declared within the next five (5) years upon the stock in said Company which now belongs to first party, or which may be acquired by first party within the five (5) year period.

## II.

"First party hereby guarantees the payment of the salary agreed to be paid to second party by Nueces Lands Irrigation Company in said contract.

## III.

"In the event that within said five (5) year period first party should foreclose the liens which he now holds against the properties of Nueces Lands Irrigation Company, first party agrees that he will enter into a contract with second party, in which the spirit of said contract between Nueces Lands Irrigation Company and second party will be carried out for the remaining portion of said five (5) year period, and in which first party will agree to divide equally with second party the net profits realized from the operation and/or sale of said properties prior to the expiration of the five (5) year period above mentioned, and it being understood that in such event first party shall receive his entire investment plus six per cent (6%) interest before any profit can be considered to have been earned.

## IV.

"In the event that first party should sell or assign his stock and liens in and against said Company prior to the expiration of the five (5) year period, or in the event said Company should sell or assign within said period all its properties to any party other than first party, second party shall have the election of receiving from first party the salary for the remaining portion of said five (5) year period at the rate of Seven Hundred Dollars ($700.00) per month, or of receiving one-half (1/2) of the profit realized by first party on the transaction, first party receiving his entire investment plus 6% interest before any profit shall be considered to have been earned. Second party's right to receive the salary for the remaining portion of said period upon his electing to do so upon the happening of either of the above contingencies, shall be conditional upon his devoting his time and services somewhere in the United States for the benefit of first party, as first party may direct.

## V.

"Second party hereby agrees that first party shall receive one-half (1/2) of all the net profits realized during said five (5) year period by second party from any and all of his operations in connection with the drilling of wells, and the sale of well equipment.

"Executed in duplicate this 26th day of July 1928.
(Signed) W. T. Eldridge,
First Party,
(Signed) R. J. Bauereisen,
Second Party."

Pursuant to the provisions of the contract between Bauereisen and the Irrigation Company the drilling rig and tools were removed to the premises and Bauereisen entered upon the discharge of his duties as general manager of the enterprise. He had charge of farming operations, erection of improvements, drilling and equipping wells, clearing land, purchasing supplies for the commissary, marketing the crops produced, buying implements and tools, keeping books and accounts, keeping time of employees and paying employees. His exact duties with reference to the selling of land are not made clear, but it appears that he had a sales agent in San Antonio.

In the Spring of 1929, a few months after Bauereisen became general manager of the enterprise, Eldridge transferred and assigned his stock in the Irrigation Company and his liens against its property to Sugarland Industries and Bauereisen was informed of that fact. The selling of the stock and liens was one of the contingencies provided for in Section IV of the contract between Bauereisen and Eldridge above copied. In accordance with the provisions of that section Eldridge called upon Bauereisen to exercise his right of election of receiving his salary of $700.00 per month or one-half of the profits realized by Eldridge on the transaction. Since no profits were realized, but on the contrary, a loss of approximately $350,000.00 was sustained in the enterprise, Bauereisen elected to receive his salary of $700.00 per month in accordance with the terms and conditions of Section IV.

Thereafter, Eldridge procured an agreement from Texas Fig, Inc., a subsidiary of Sugarland Industries, that it would accept Bauereisen as its sales representative in Oklahoma to sell figs. By the terms of the agreement a commission of 15 per cent was to be paid to the account of Eldridge. This offer was communicated by Eldridge to Bauereisen. It appears that the arrangement contemplated by Eldridge was for him to pay the salary of $700.00 per month to Bauereisen and himself receive what commission Bauereisen might earn. Texas Fig, Inc. reserved the right to terminate the employment upon 10 days notice. It appears that Eldridge offered this employment to Bauereisen some time in May, 1929. On June 11 thereafter, Bauereisen not having either accepted or rejected the offer, Eldridge wrote him as follows:

"It has now been several weeks since I offered, in compliance with Paragraph IV of our contract dated July 26th, 1928, to give you employment with Texas Fig, Inc., at a salary of $700.00 per month, and you have not yet indicated whether you would accept or reject the position.

"Not only does the Fig Company want to fill the place without delay, but I feel that I am entitled to more promptness on your part. Consequently, I am asking that you report at Sugarland ready to go to work with the Fig Company not later than Wednesday of next week, the 19th of June. Your failure to so report, unless caused by sickness or emergency beyond your control, will be treated by me as releasing me from further responsibility under the contract."

By a letter dated June 17, 1929, Bauereisen declined to accept the offered employment. That letter, omitting the introduction and conclusion, reads as follows:

"I am in receipt of your letter of June 11th, referring to paragraph IV of our contract dated July 26th, 1928, and of your offer to give me employment with the Texas Fig, Inc., at a salary stipulated in our contract.

"I have concluded to reject the offer of employment by the Texas Fig, Inc., in lieu of my employment under my contract with the Nueces Lands Irrigation Company, and your guarantee, because as you know I am not a fig salesman. In fact, I am an engineer by profession, a member of the American Society of Mechanical Engineers and other Engineering Societies, have had years of study and of work fitting myself for my profession and I could not accept employment outside of my profession, or work closely identified to same without great damage to myself since I have been an engineering executive for some time.

"Furthermore, letter written by the Texas Fig, Inc., clearly showed that my employment as a fig salesman is in all probability a mere temporary employment. Were I to accept same and move with my family to some point in Oklahoma, my contract with the Texas Fig could be terminated by them upon short notice, and I would again be confronted with a move and new and different employment.

"When you and I executed our contract of July 26th, 1928, I am sure that it was not in your mind any more than it was in mine, that, in order to protect myself under your guarantee, I would be compelled to accept a position as traveling salesman for the sale of figs. Certainly, no such thing was in my mind and I am sure you realize that had either of us intended by

such agreement to permit you to require me to work as a fig salesman, thus giving up all contact with my profession I would never have executed either my contract with you or the one with the Nueces Land Irrigation Company.

"The suggestion and offer that I made you that you allow me to carry on in a well contracting business still seems to be the most logical. You to pay me the stipulated salary in accordance with your contract and that we divide the net profits derived from the drilling of wells and the sale of pumping equipment as per the last paragraph of our contract. I can not help but believe that such an arrangement will net you a better return than if I followed the pursuit of a traveling salesman, a work for which I am neither trained nor fitted.

"I do not like to doubt the good faith with which your offer of employment of me as a fig salesman is made, but it does seem to me that a salary of $700.00 and traveling expenses is rather excessive for a fig salesman—certainly, such a fig salesman as I would probably prove to be; and even if you should decline my suggestion as to further well drilling operations, you should have work for me to do more nearly in line with that which I have fitted myself to do.

"I shall, therefore, not report on Wednesday of this week, June 19th, for work with the fig company, and I will not treat this refusal on my part as releasing you from further responsibility under your contract with me. I am still willing to perform any work for you, upon the salary agreed upon, that I am capable and qualified to do, and I would like to hear from you further as to any other and different employment which you may have to offer."

Eldridge died on August 20, 1932, leaving a will in which Guardian Trust Company was named independent executor. Thereafter this suit was filed by Bauereisen against Nueces Lands Irrigation Company and the executor, resulting in a judgment in favor of Bauereisen against the executor for $40,000.00. As against the Irrigation Company the judgment was that Bauereisen take nothing. The executor appealed, but Bauereisen did not appeal from that portion of the judgment denying him any recovery against the Irrigation Company. The Court of Civil Appeals at Galveston by a majority opinion affirmed the judgment of the trial court and this court granted the application of the executor for writ of error.

■ In construing these contracts we have kept in mind these principles. First. They were executed contemporaneously as a part of one transaction and should be construed as a whole. No

one phrase, sentence or section should be isolated from its setting and considered apart from the other provisions. 10 Tex. Jur. Sec. 164, pp. 282 et seq. Second. It is proper to consider parol testimony as to the circumstances surrounding the parties out of which the contracts grew, not to add to or vary their terms, but to apply the contracts to the subjects with which they deal for the purpose of ascertaining the real intention of the parties. First National Bank of Amarillo v. Rush (Com. App.) 210 S. W. 521; Ryan v. Kent, 36 S. W. (2d) 1007. Third. In construing a contract of employment where the contract is silent as to the duties to be performed by the employee it will be presumed that the parties had in mind reasonable duties; that they contracted with reference to the reasonable and not the unreasonable. 10 Tex. Jur. Sec. 181, pp. 313 et seq. Fourth. An employer has not the right to make a material change in the position to which his employee is entitled under the contract of employment, and the employee is justified in refusing to submit to such change. Such refusal does not amount to a breach of a contract on his part. Kramer v. Wolf Cigar Stores Co., 99 Texas 597, 91 S. W. 775. In fact, as stated by this Court in the case last cited, his consent to the proposal might operate to change the original contract and deprive him of any right to claim that it has been broken by the employer.

■ That the first three principles have application, both parties agree. We experience no difficulty in determining that the fourth principle is not applicable to the case before us. Were this a suit between Bauereisen and the Irrigation Company upon the original contract and it had been shown that the Irrigation Company undertook to change Bauereisen's employment from that of superintendent to that of a salesman the principle would be applicable. But, as the case reaches this Court, it is not that kind of case at all. Bauereisen joined the Irrigation Company in this suit and suffered a judgment in its favor to become final without appealing therefrom. He probably became convinced that, since he had made an election under Section IV of his contract with Eldridge he had no maintainable cause of action against the Irrigation Company. Be that as it may, this is not a suit by an employee against an employer who has undertaken to change the position of the employee from that named in the contract.

In the Kramer case and in similar cases cited from other judisdictions the contract between the parties did not contemplate a change of position. In the instant case the contracts, taken as a whole, expressly provide for a change. The

suit is upon Section IV of the Eldridge-Bauereisen contract. No cause of action could arise under that section unless and until Bauereisen elected to terminate his employment with the Irrigation Company and look to Eldridge for some unnamed character of employment.

The contract between Bauereisen and Eldridge is not, strictly speaking, an employment contract. Section IV, the one upon which the whole cause of action is based, gave Bauereisen an election of remedies under a certain contingency. That contingency having arisen, he elected to receive his salary from Eldrigde during the remaining portion of the five year period, and by an express provision of that section his right to receive such salary was conditioned upon his devoting his time and services somewhere in the United States for the benefit of Eldridge, as the letter might direct. That condition has not been met, but he contends that he is nevertheless entitled to receive that salary because Eldridge named an unreasonable condition. Our question then is not one between employer and employee, where the former has sought to lower or otherwise change the position of the latter from that denominated in the contract of employment.

The parties are presumed to have contracted with reference to reasonable conditions, and the determinative question in the case is whether the condition named by Eldridge was reasonable. In determining whether it was reasonable we do so in the light of the intention of the parties in making the contract. It is no concern of the court whether it would have been wise for Bauereisen to contract to become a salesman, but only whether he made such a contract as that it would be reasonable for Eldridge to direct him to do so as a condition precedent to any obligation on his part to pay the salary of $700.00 per month.

When these contracts were made Bauereisen understood in general the nature of the businesses in which Eldridge was engaged. He knew that much of Eldridge's business was conducted through interrelated corporations, one of which was Texas Fig, Inc. It cannot be presumed that it was the intention of the parties that upon the happening of either of the contingencies named in Section IV Eldridge would acquire some new business similar to the business in which Bauereisen had been engaged. To read such a covenant into the contract would be to make a contract for the parties. The language clearly means that when the contingency should arise Eldridge would then determine what services he required. The minds of the parties did not meet on the exact services to be performed, but

clearly met on the agreement that their character was to be determined at a future date, and we must presume that they were to be in relation to some business in which Eldridge was then engaged, for there is no suggestion that he contemplated embarking in a new one, or that any business in which he was interested required the drilling of water wells. The rule that the prior training and experience of the employee should alone be looked to, and the presumption indulged that the parties contracted with reference thereto cannot be applied. The parties contracted against its application. At least to make it applicable would require that we hold that Eldridge contemplated having some wells drilled by some one. The record precludes such holding.

This right on the part of Eldridge to direct the character of services which Bauereisen should render carried with it by implication the duty on his part not to name kind of employment that would be trivial or humiliating or one requiring skill and training beyond the capacities of Bauereisen. But a position as traveling salesman is not one that humiliates or degrades a man. A traveling salesman is not looked down upon by men of any profession or calling. It is an honorable occupation. Neither does his work require technical ability of a nature not possessed by Bauereisen. There is nothing in this record that would justify this Court to hold that Bauereisen was unfitted for the work of a salesman or that Eldridge acted unreasonably in directing him to undertake such employment. If there was any other employment under the control of Eldridge more suitable, it is not suggested by the record, and, as suggested above, we cannot read into the contract a covenant to establish any new business.

But it is claimed that by Section V of the Eldridge-Bauereisen contract it was contemplated that, upon the happening of the contingency giving rise to this cause of action, the two parties should embark in a well drilling enterprise. If that had been the intention of the parties, no reason is perceived why it was not so stated in Section IV. Section V clearly refers to the provisions of the contract between Bauereisen and the Irrigation Company, in which the former was, by permission of the President of the latter, to engage in work of this nature during the time he was acting as general manager of the irrigation project. We can find no reason for construing Section V as evidencing the character of services which Bauereisen was to render for the benefit of Eldridge under Section IV.

It is claimed that Section III throws light upon that subject. It is evident that the parties contemplated by Section

III that, if Eldridge should foreclose his liens against the property of the Irrigation Company, he would become the purchaser, and the obligation was then to enter into a new contract carrying out the spirit of the first one. Section IV deals with the rights of the parties in a situation where Eldridge has parted with his interest in the Irrigation Company, and it would be doing violence to the contract to hold that it was the intention to provide the same character of employment after parting with this project as that which would be provided in case he should become the owner thereof.

The objection that to accept the employment required Bauereisen to move to Oklahoma is not a valid one, for he contracted to render his services anywhere in the United States. The objection that the employment might terminate in a short time is likewise not valid, for the contract did not provide that he was to render his services in one particular employment during the whole of the remainder of the five year period.

Viewing the case as a whole, and construing the contracts together we are led to the conclusion that, by the terms of Section IV Eldridge had the right to direct Bauereisen to render reasonable services in his interest, to be determined by the situation as it should exist at the time the contingency might arise, and that the proffered employment was not unreasonable. It is accordingly ordered that the judgments of the trial court and Court of Civil Appeals be reversed and that judgment be here rendered that defendant in error take nothing. All costs in all courts will be taxed against defendant in error.

Opinion adopted by the Supreme Court November 30, 1938.

Rehearing overruled February 15, 1939.