Argued April 1, reversed and remanded April 26, 1961

# BONNEVIER ET UX *v.* DAIRY COOPERATIVE ASSOCIATION

### 361 P. 2d 262

*John C. Anicker,* Oregon City, argued the cause for appellants. On the brief were Jack, Goodwin & Santos, Oregon City.

*Lofton L. Tatum,* Portland, argued the cause for

respondent. On the brief were Wood, Matthiessen, Wood & Tatum and Malcolm H. Clark and L. Guy Marshall, Portland.

Before McAllister, Chief Justice, and Rossman, Warner, Sloan and Lusk, Justices.

ROSSMAN, J.

This is an appeal by the plaintiffs, husband and wife, from an order of the circuit court which vacated a judgment in the plaintiffs' favor and ordered a new trial of the action. The vacated judgment, in the sum of $10,000, was based upon a jury's verdict. The challenged order was entered upon the defendant's motion. After the plaintiffs had appealed, the defendant cross appealed from another order of the trial judge which denied its motion for the entry of judgment in its favor non obstante veredicto.

■ When a plaintiff appeals from an order which was entered upon the defendant's motion for a new trial the defendant may cross appeal from an order which denied an additional motion made by the defendant for the entry of judgment in its favor notwithstanding the verdict. *Hillman v. Northern Wasco County PUD*, 213 Or 264, 323 P2d 664. The holding of that case has been placed in legislative form by ORS 19.130 (2).

The action which yielded this appeal and cross appeal was instituted by the plaintiffs upon charges that the defendant breached a parol contract which the plaintiffs say they and the defendant entered into in May of 1956. Whether or not the parties effected the alleged contract was the principal issue of the trial. The plaintiffs maintain that the parties entered into the contract. The defendant denies that contention. If the parties entered into the contract the

plaintiff, Oscar V. Bonnevier, became entitled to employment in the defendant's plant as soon thereafter as he was able to work.

The plaintiff, Oscar V. Bonnevier, entered defendant's employ in 1946 as a truck driver. He operated a truck into areas adjacent to Portland and there picked up cans of milk which he brought to the defendant's plant in Portland. After he had pursued his employment for some years he sustained an injury, but upon his recovery returned to the defendant's employ. In the latter part of November 1954 he suffered another injury and was compelled to remain idle until the early part of February 1955. He then returned to work, but April 10, 1956, the injury of November 1954 rendered it necessary for him to again refrain from work.

We abandon temporarily mention of the convalescence of the plaintiff, Oscar V. Bonnevier, to take note of another matter which is related to the issue as to whether or not the parties formed the alleged unwritten contract.

In 1952 the plaintiffs purchased a home which was located one block south from the defendant's plant. The price they paid for the property became a matter of importance during the trial. The plaintiff, Dorothy C. Bonnevier, testified that the purchase price of the property was $10,000 but conceded that the price "included the furniture." Her words were: "They sold the house for $10,000. They said it included the furniture." Her husband, Oscar Bonnevier, gave the following testimony:

"Q At the time you bought the property from Mr. and Mrs. Thompson you were given a title insurance policy, were you not?

"A Yes, sir.

"Q And isn't it true that that title insurance policy was for only $8,500?

"A Well, that included some furniture that was there, too.

"Q So you actually paid only $8,500 for the house, is that right?

"A No. With the furniture we paid $10,000.

"Q With the furniture you paid $10,000?

"A That is right.

"Q But the value of the house and the land was only $8,500, wasn't it?

"A That is right."

The plaintiffs testified that after they acquired the home they improved it at a cost of about $2,000.

About four years after the plaintiffs had purchased their home the defendant decided to expand its plant. Its expansion program contemplated the acquisition of the plaintiffs' home which, as we have said, was one block south of the plant. A representative of the defendant called upon the plaintiffs to negotiate for the purchase. At that time the plaintiff, Oscar Bonnevier, as we have said, was confined to his home by the injury which he had sustained in November 1954. The negotiations with the defendant's representative were fruitless and thereupon Mrs. Bonnevier wrote a letter to Mr. William Henry, who was the defendant's general manager. The letter stated:

"* * * A Mr. Yoke, representing your company, contacted us at the same time he contacted the owners of the houses on Sixth Avenue, and which were later bought by your company. Mr. Yoke informed us that two of those houses were sold for $10,000 and the other for $12,500. These homes were originally bought quite some time ago for far less money than we paid for ours three and one half years ago. In fact, one of the homes was bought eleven years ago for $2,000. We paid

$10,000 for ours, and an additional $1,200 for improvements since taking possession. We have turned down two offers of $13,500, one a few weeks after Mr. Yoke was here, and the other a few months ago, as we wished to give you first preference. In closing I wish to state that I believe you to be fair and just in all your dealings, and would appreciate very much your setting these facts before the Board members at your next meeting. I am quite confident that a price can be agreed upon that will prove satisfactory to all concerned. Thanking you for your patience, and hoping to hear from you soon, I am, sincerely, Mrs. Oscar Bonnevier."

After his receipt of Mrs. Bonnevier's letter Mr. Henry made two calls upon the plaintiffs in May 1956. It is agreed that nothing of consequence was said or done upon the first call. But during the second, according to the brief of the plaintiffs, "a contract was entered wherein in consideration of plaintiffs selling the home for $12,000, defendant agreed to grant Oscar job security or re-employment when he recovered from his injury." The defendant concedes that it agreed in the course of the second visit to purchase plaintiffs' property at a price of $12,000, but denies that it agreed to provide employment for Mr. Bonnevier.

Both of the plaintiffs gave testimony in support of the contention made by their brief which we just quoted. That of Mr. Bonnevier, as quoted in the plaintiffs' (appellants) brief, follows:

"A Well, that discussion consisted of—my wife mentioned that home we had and the money we had into it, it didn't seem like enough for industrial purpose unless my job was more secured.

"Q What didn't seem enough?

"A The price.

"Q The price didn't?

"A Didn't seem right.

"Q Which price?

"A Of $12,000.

"Q Now, as near as you can remember, repeat what your wife said?

"A Well, she says that that didn't seem like a fair enough price, and, 'knowing that my husband's job—as far as my husband's job was concerned also.'

"Q And did Mr. Henry have any response to that?

"A He did.

"Q What did he say?

"A He says, 'We will be glad to have you back to work when you are able, Oscar.'

"Q And what did you say to that?

"A I asked my wife, then, I says, 'Honey, what do you think; shall we let it go at this price?' She says, 'Well, knowing your job to be secure, yes.'

"Q What did you do then?

"A I shook hands with Mr. Henry figuring that being the general manager of Dairy Cooperative, his word was good."

Mrs. Bonnevier gave the following testimony which is also quoted in the plaintiffs' brief:

"Q And on his first visit do you know what was discussed with Mr. Henry?

"A Well, there wasn't much discussed about the property at his first visit. It was the second or third visit that I believe we sold.

"Q Now, in reference to the visits where you actually discussed the property and the sale price, what was said at that time?

"A Well, Mr. Henry said that the Board members would agree to $12,000; they wouldn't go beyond that price.

"Q And what was said concerning that?

"A Well, I thought it was a very low price.

"Q Did you say that?

"A Yes, I did say that.

"Q How did you say it?

"A I said, 'Well, it seems such a low price for a piece of property like that.'

"Q All right. Did you say anything else at that time?

"A Well yes. After we discussed it a while I said, 'Well, if I thought that my husband's job would be secure I wouldn't mind letting it go for that.'

"Q All right. And what did Mr. Henry say to that?

"A Well, he turned to my husband and says, 'Well, you know, Oscar, we will always be glad to have you back when you are able.'

"Q And did Mr. Bonnevier have any response to that?

"A Well, he got up and then they shook hands on it.

"Q Did he say anything to you, do you recall?

"A Well, he said, 'Well, honey, is it all right to let it go for that?' And I says, 'Well, knowing your job is secure, yes.'

"Q And they shook hands on it?

"A Yes, that is right."

The above concluded the negotiations. There were no more conferences. After the second conference the defendant purchased the plaintiffs' property at the price of $12,000. Since only the plaintiffs and Mr. Henry were present when the conferences occurred, the plaintiffs call attention to no other testimony concerning their contention that a contract was effected

whereby Mr. Bonnevier was assured of employment. Mr. Henry, as a witness, was asked:

"Q You heard the testimony of Mr. and Mrs. Bonnevier that you were supposed to have said during that meeting in which the $12,000 was finally agreed upon, 'Well, now, Oscar, you know we will be glad to see you back to work when you are able.' Do you recall making that statement to him?

"A Well, I don't recall making that statement, but it would be the natural thing to do. If a man is incapacitated in our employ, usually, if they recover and are satisfactory employees, we can take them back on the job. We don't put a man off because he receives an injury."

When Mr. Bonnevier was asked to express an opinion as to the value of his property "for industrial purposes" he answered:

"A Well, it should have been worth at least twenty to twenty-five thousand dollars."

In response to a similar question Mrs. Bonnevier testified:

"* * * I really thought it should sell between 20 and $25,000."

Neither of the Bonneviers said anything further as to the property's value. Although Mrs. Bonnevier's letter to Mr. Henry stated, "We have turned down two offers of $13,500," as a witness she said nothing upon that subject. An appraiser who was called as a witness by the defendant testified that at the time of the defendant's purchase of the property the latter's market value was $8,700.

When the plaintiff believed that he was able to do light work he called at the defendant's plant and spoke to a foreman who gave him no employment but walked away. Shortly, he spoke to another foreman

with whom he had an acquaintanceship and who replied: "I will see that you get a light job," but requested that he return the following morning. The following morning, according to the plaintiff:

> "A I went down and he said he hadn't heard anything and he was going to see different ones down at the Mayflower plant. I went there the next couple of mornings. And then he says, 'Well, I will get in touch with you personally and I will call you.' That is the last I heard of it."

He was given no employment and later filed this action. Mr. Bonnevier has never been able to resume his work as a truck driver. His wife testified:

> "Q And Mr. Bonnevier has never been able physically to resume his job as a truck driver; isn't that correct?
> "A No, he couldn't possibly."

The plaintiffs make no claim that the defendant was liable on account of Mr. Bonnevier's injuries.

The plaintiffs present only one assignment of error. It reads: "The Court erred in sustaining defendant's motion for a new trial."

■ As is known by all, a purported meeting of the minds in order to effect a contract must render reasonably certain all of the terms of the would-be undertaking so that a court, in the event of litigation, may know what each of the alleged contracting parties bound himself to do. If a court is to enforce an alleged agreement by decree or judgment it must be able to ascertain from the agreement itself, whether parol or written, the duties of those who, it is claimed, bound themselves to the alleged future course of action.

However reluctant the courts may be to reject the suit of parties who thought that they had effected a contract, yet if the parties, in negotiating, spoke

only in terms of generalities and left uncertain what each was expected to do, the court could not enforce the purported agreement unless it itself wrote the contract. The court will not write contracts for parties.

*Gaines v. Vandecar*, 59 Or 187, 115 P 721, 115 P 1122, expressed the requirement for reasonable certainty in these words:

"Every contract must be definite and certain as to the terms to be performed by either party, and, if it is so uncertain and ambiguous that the court is unable to collect from it what the parties intended, the court cannot enforce; and since there is no obligation there is no contract. If the contract in any case is so indefinite as to make it impossible for the court to decide just what it means, and fix exactly the legal liability of the parties, it cannot result in an enforceable contract. * * *"

Restatement of the Law, Contracts, § 32, says:

"An offer must be so definite in its terms, or require such definite terms in the acceptance, that the promises and performances to be rendered by each party are reasonably certain."

Comment a, which is appended to that statement, declares:

"Inasmuch as the law of contracts deals only with duties defined by the expressions of the parties, the rule stated in the Section is one of necessity as well as of law. The law cannot subject a person to a contractual duty or give another a contractual right unless the character thereof is fixed by the agreement of the parties. * * * A promise by A to give B employment is not wholly illusory, but if neither the character of the employment nor the compensation therefor is stated, the promise is so indefinite that the law cannot enforce it, even if consideration is given for it."

Williston on Contracts, 3rd ed, § 42, states:

"* * * a promise * * * 'to give employment' without specifying its nature or compensation * * * are all too vague. * * *"

Corbin on Contracts, § 95, declares:

"A court cannot enforce a contract unless it can determine what it is. It is not enough that the parties think that they have made a contract; they must have expressed their intentions in a manner that is capable of understanding. It is not even enough that they have actually agreed, if their expressions are not such that the court can determine what the terms of that agreement are. Vagueness of expression, indefiniteness and uncertainty as to any of the essential terms of an agreement, may prevent the creation of an enforceable contract."

*Seiss v. McClintic-Marshall Corporation,* 324 Pa 201, 188 A 109, was an action for breach of an alleged contract for employment. The trial court entered judgment for the defendant non obstante veredicto. The decision under review affirmed that disposition of the case. Prior to February 1915 the plaintiff had been in the defendant's employ as a fitter at wages of 44 cents an hour. He then met with an injury and spent several weeks in a hospital. He alleged that in consideration of his refraining from suing the defendant for damages it agreed to employ him for life. He testified, "the meaning of it was that they were supposed to take care of me in regard to suitable employment I was to do, and they were to take care of all medical attention afterwards. It said in the agreement they would take care of me for life in employment that I would be able to do." We now quote from the opinion:

"The contract here set up is so lacking in precision, so indefinite and vague, that nothing cer-

tain about it can be formulated. 'In order that a contract may be enforceable the promise or the agreement of the parties to it must be certain and explicit, so that their full intention may be ascertained to a reasonable degree of certainty.' Edgcomb v. Clough, 275 Pa. 90, 103, 118 A. 610, 614; McNeely v. Bookmyer, 292 Pa. 12, 15, 140 A. 542, 543; Restatement, Contracts, § 32; Williston on Contracts (Rev. Ed.) § 42. What is 'suitable employment'? Who is to determine what it is? What is implied by 'any employment that I was able to do'? Without more these words are too indefinite to predicate anything upon with certainty. As was said by Judge Elder W. Marshall in writing the majority opinion of the court below: 'In the contract here sued on, no rate of pay is specified; no arbiter is provided to determine what work plaintiff will be able to perform  *  *  *.'"

*Laseter v. Pet Dairy Products Co.,* 246 F2d 747, was based upon an averment, made by the plaintiff, that the defendant for a consideration promised to provide for him (the plaintiff) "light work," and breached the promise. The District Court at the close of the plaintiff's testimony dismissed the action on the ground that the plaintiff had shown no right to relief. The plaintiff entered the defendant's employ in 1951 as a route salesman delivering milk. In 1953 he underwent surgery, and after 90 days, during all of which he was paid full compensation, resumed his employment. In October of 1954 he again underwent surgery and again in his period of incapacity was paid full compensation. At the conclusion of that period of convalescence he returned to his work, but in March of 1955 he was compelled to undergo further surgery. In the third period of 90 days, during which he performed for the defendant no service, he was paid full compensation. The contract between the de-

fendant and the labor union of which the plaintiff was a member provided that the defendant should not be required to retain in its employment anyone physically unfit "provided, however, that, if the employee's condition is such that he is acceptable and able to do some work in the plant, such work shall be given to him as far as it is practicable and his wages adjusted accordingly." The plaintiff testified that the defendant's Plant Manager told him that he would be given light work when his doctor certified that he was physically capable of performing it. In July 1955 the plaintiff presented to the defendant a certificate from his physician which stated that he was capable of performing light work. He then asked for work.

"In assuring the employee that they would take care of him and would give him light work when his doctor would certify that he was capable of performing it, officials of the employer were recognizing their obligation under Section 9 of Article 8 of the contract with the Union and expressing their intention to comply with it. Under the circumstances, such expression of intention to comply with their established obligations is natural, but should not be construed as an offer to enter into a separate and special contract of employment. The fact that the assurances were general, not specific, particularly in the light of the provisions in the contract with the Union prohibiting individual bargaining, lends great weight to this conclusion.

"Should we assume that there was an intention to enter into a separate and special contract of employment, as the employee would have us do, he is still met with insurmountable obstacles.

"If the intention to enter into a contract of employment was clear, we should be reluctant to hold the contract too indefinite to be enforceable. The assurances here, however, contain none of the essential terms of an employment contract. No

specific job was mentioned, nor was there any discussion of rates of pay, hours of employment or its duration. We cannot supply these terms by reference to other jobs for the record does not show that there was any existing job in the plant which the employee was capable of performing.

\* \* \*

"Indeed, the employee does not claim that he was capable of performing any existing job, or that any such job was promised. His claim, based upon the conditional discussion when he reported for work on July 18, 1955, is that a job of loading empty crates upon the conveyor going to the washer should have been created and given to him. He guessed that the rate for such a job would be between $1.05 and $1.10 an hour but he did not testify there was any discussion of it. It is possible that the loading of empty crates would be done only in the afternoon when the delivery trucks with empty crates returned to the plant and would require but a short time for its performance, but the silent record gives us nothing upon which we can even speculate as to the number of hours per day or per week the performance of this operation would require.

"The Court cannot write a contract for the parties. When the parties have not, expressly or by implication, agreed upon essential terms of a contract, the Court cannot supply them. As Professor Williston says:

" 'It is a necessary requirement in the nature of things that an agreement in order to be binding must be sufficiently definite to enable a court to give it an exact meaning.' 1 Williston on Contracts, Revised Edition, § 37, page 98.

" '\* \* \* So, \* \* \* (a promise) "to give employment" without specifying its nature or compensation \* \* \* (is) too vague.' 1 Williston on Contracts, Revised Edition, § 42, pages 120-121.

"See also, Anderson v. Hall, 155 S.C. 320, 152

S.E. 521; McLaurin v. Hamer, 165 S.C. 411, 164 S.E. 2; Seiss v. McClintic-Marshall Corp., 324 Pa. 201, 188 A. 109; 1 Restatement of the Law, Contracts, § 32."

■ In the case at bar the purported agreement which the plaintiffs seek to enforce mentions no specific job, nor do the plaintiffs claim that in their discussion with Mr. Henry the subject of wages was even once broached. Although the plaintiffs argue that the agreement contemplated that the defendant should provide light work for Mr. Bonnevier, the term "light work" was not uttered in the negotiations. Both of the plaintiffs concede that Mr. Bonnevier is physically incapable of resuming his old job.

Significant is the fact that the plaintiffs do not claim that any term was mentioned for the employment which they say the defendant promised. If the employment was without term the plaintiff could be discharged the following day, and that would, of course, indicate that no contract had been effected. But, if it was to run permanently, then the parties surely would have approached its formation with more attention to details than was indicated by the accounts which they gave and which are quoted upon previous pages of this opinion. They would have discussed wages, type of work and similar pertinent facets. It may be that no contract was envisioned when the Bonneviers looked to the day when Mr. Bonnevier would again be able to resume work. Possibly at that time they were not interested in negotiating a contract of employment, but were anxious to have the good will of a large employer such as Mr. Henry.

In their agreement concerning the sale of their real property the plaintiffs agreed upon precise details, but discussed nothing of that character concerning the

employment. We do not believe that they effected any agreement of the kind which is set forth in the complaint.

Viewing the situation in the manner above expressed, it follows that the defendant's motion for judgment nothwithstanding the verdict should have been granted. We therefore remand the case to the circuit court with instructions to sustain that motion.