A. P. MAXWELL, Appellant,

v.

CARDINAL PETROLEUM CORP., Appellee.

No. 7153.

Court of Civil Appeals of Texas, Beaumont.

Sept. 10, 1970.

Rehearing Denied Oct. 22, 1970.

Second Motion for Rehearing Denied Nov. 25, 1970.

Orgain, Bell & Tucker, Joe Farris, Jr., Beaumont, for appellant.

Mehaffy, Weber, Keith & Gonsolin, Beaumont, Cox, Smith, Smith, Hale & Guenther, San Antonio, for appellee.

PARKER, Chief Justice.

This is an action for damages for breach of an employment contract. Although trial was to a jury, the court instructed the verdict for defendant at the close of plaintiff's evidence and judgment was entered accordingly. The parties will be referred to here as they were in the trial court. The plaintiff, Arthur Paul Maxwell, will be called "Maxwell"; Mission Enterprises, Inc. will be called "Mission"; and Cardinal Petroleum Corp. will be called "Cardinal".

The pleadings and the evidence show that Maxwell had been in the crude oil business in the Beaumont area as a stockholder and president of Mission since 1963. At the time of the sale of this business to Cardinal by Mission, the business consisted of buying crude oil at the wellhead, transporting it to market and selling it at a profit. Purchases of oil were limited to production where no pipeline connections were had. In November, 1967, Cardinal and Maxwell reached an agreement whereby Cardinal agreed to purchase the principal assets of Mission, a family-owned corporation of which Maxwell was president. Negotiations having been completed, the parties entered into a written memorandum of their agreement on November 16, 1967. This memorandum contained no provisions for the employment of Maxwell by Cardinal for a period of five years, but did pro-

vide for employment of Maxwell by Cardinal for an unspecified period at a salary of $24,000.00 per year upon the consummation of the purchase-sale transaction. This memorandum contemplated a formal contract between the parties, but no other instrument in writing was executed, except on November 29, 1967, the president of Cardinal wrote Maxwell the following letter:

"This letter will evidence the agreement of Cardinal Petroleum Corp. to employ you at a minimum salary of $24,000.00 per year, payable in equal monthly installments at the end of each month. Your employment will be effective December 1, 1967 and continue at the above salary for a period of five years from that date, providing that you are able and satisfactorily perform the necessary services."

The word "minimum" was added to the typewritten letter in ink and initialed in the margin.

The letter specifically and clearly provides that the employment at the stated salary would continue *"providing that you are able and satisfactorily perform the necessary services."*

The parties closed their agreed transaction on November 30, 1967. The monetary considerations expressed in the memorandum were then and have been since, recognized as the total agreed monetary considerations. Maxwell has acknowledged receipt of all monetary payments thus far due under the agreement and additionally expects the final payment of $25,000.00 in January, 1971. The considerations paid and received by Maxwell under the contract of sale are as follows:

Agreed down payment of $25,000.00 cash paid November 30, 1967;

Debts totaling $27,119.30 assumed by Cardinal November 30, 1967;

Initial $25,000.00 cash payment made on the negative covenant provision January 10, 1968;

Second $25,000.00 cash payment made on the negative covenant provision January 10, 1969;

Third $25,000.00 cash payment made on the negative covenant provision January 10, 1970;

A sum of $25,000.00 cash remains to be paid to Maxwell on January 10, 1971, under the negative covenant provision of the memorandum.

Maxwell went to work for Cardinal on December 1, 1967, under the provisions of the letter agreement. He had been in the crude oil purchase-sale business approximately 27 years. He was designated Cardinal's Southeast Texas Division Manager. He had convinced Cardinal he could increase crude oil purchases and sales in excess of what Mission was then purchasing and selling and could acquire substantial production for Cardinal in the State of Louisiana. Cardinal purchased his business in an area where they had not previously operated, making the investment with the idea of increasing the volume of business. In negotiating the sale, the possibility of obtaining new business for Cardinal was discussed with Maxwell. He suggested he could do a better job if he were relieved of some of the burdens which he had previously had as owner-manager of Mission. At the time Maxwell sold the business to Cardinal, he was operating three trucks in the Beaumont-Houston trade area.

In a letter dated April 23, 1968 from Cardinal to Maxwell, which he admitted receiving, it complains:

"During the month of December, 1967, under your recommendations we had made arrangements for 7 complete rigs for which sufficient business as of this date had not been secured. We still have these units standing by hoping that

you will come up with sufficient volume whereby we can move these units into that area.

"You can readily see that we have over extended our equipment projection for this area and need to do something about increasing this volume immediately."

Maxwell admitted that not only on April 23, 1968, but prior thereto, Cardinal complained to him of his failure to obtain new business, but denied that Cardinal made "some trucks and trailers available to provide you for the additional transportation you predicted" but admitted that on a regular basis he had, at least for March, two more trucks assigned to him than he had on December 1, to take care of the additional business he obtained immediately before his sale to Cardinal.

Maxwell testified that at the time of purchase he knew Cardinal expected him to increase business. Cardinal relieved him of many of the burdens he had previously had as owner-manager of Mission. Always he understood that he had to earn his salary and to pay his way. Cardinal relieved him of the duties of supervising and pushing trucks, buying pipelines and pipeline right-of-ways and supervising pipeline activities, and the burdens of debt, finance and direct management. To further assist him in obtaining new production, Cardinal provided Maxwell with an office, secretarial services, trade reports, a car and expense account. Maxwell knew before the sale to Cardinal and thereafter that a purchaser of crude oil would have no business eventually if he did not continuously acquire new business. He knew old wells would be depleted and pipelines would sometimes take other production previously marketed by truck.

Beginning in the second month after Maxwell was employed by Cardinal, he knew his necessary services were not being performed to Cardinal's satisfaction for the reason that he was not obtaining new business. Cardinal continuously thereafter kept in contact with Maxwell, urging him to try to get new business and finally gave him notice to get new business or his employment would be terminated. Having failed to obtain any new business in four months, he was discharged at the end of December, 1967. He was paid his thirteen months salary during the time of his employment—$26,000.00.

It is undisputed that all the other facets of the crude oil business were taken care of by other members of the Cardinal organization. There was no other "necessary service" to be performed by Maxwell for Cardinal except to buy additional and new production of oil. It is true that the contract of November 29, 1967 did not spell out in detail the exact duties that Maxwell was to perform or the means and methods that he was to use in achieving the contemplated results. But there was no occasion for such detail. Presumably, Maxwell, as a man of experience in this crude oil purchase-sale business, knew what he was supposed to do and how to do it. The practical construction placed upon this employment contract by the parties themselves constitutes the highest evidence of their intention. Lone Star Gas Company v. X-Ray Gas Company, 139 Tex. 546, 164 S.W.2d 504 (1942).

It is undisputed that Cardinal was dissatisfied with the services rendered by Maxwell because he was not able to satisfactorily acquire new business which was a necessary service for which he was employed. Guardian Trust Company v. Bauereisen, 132 Tex. 396, 121 S.W.2d 579 (1938) holds on page 583:

"It is proper to consider parol testimony as to the circumstances surrounding the parties out of which the contracts grew, not to add to or vary their terms, but to apply the contracts to the subjects with which they deal for the purpose of ascertaining the real intention of the parties. First National Bank of Amarillo v. Rush, Tex.Com.App., 210 S.W. 521; Ryan v. Kent, Tex.Com.App., 36 S.W.2d 1007."

As stated in Maxwell's brief:

"Trinity Universal Insurance Co. v. Ponsford Bros., [Tex.Civ.App.,] 414 S.W. 2d 16, affirmed, Trinity Universal v. Ponsford Bros., 423 S.W.2d 517 (Sup.Ct. 1968):

" 'To sum up, it has long been the law that the basic rule in construing a contract is to ascertain the intention of the parties from the words used in the contract, construed in the light of the facts and circumstances surrounding the parties at the time the contract was made, as well as the purpose sought to be accomplished, and such proof or evidence is not considered to be an attempt to vary the terms of an executed instrument.' "

■ The details and duties Maxwell had to perform to acquire new crude oil, although not spelled out in detail, were real and certain, constituting the "necessary service" to Cardinal. As its Southeast Texas Division Manager, he did not satisfactorily perform. This was a good and sufficient ground for his discharge. As stated in 56 C.J.S. Master and Servant § 54, p. 461:

"What constitutes a good and sufficient cause for the discharge of the employee is a question of law, and, where the facts are undisputed, it is for the court to say whether the discharge was justified."

Helsby v. St. Paul Hospital and Casualty Company, 195 F.Supp. 385, 390 (U.S.D.C., D.Minn., 4th Div., 1961), affirmed and the reasoning approved in St. Paul Hospital and Casualty Company v. Helsby, 304 F.2d 758 (8th Cir., 1962).

As stated in Cardinal's Reply Brief:

"Considering that Cardinal and Maxwell knew about the crude oil business, that

Maxwell was relieved of all operational duties of the business, and that the business depended upon the continuous development of new sources and markets for oil, leads to the unavoidable conclusion that the parties reasonably contracted for Maxwell to generate new business for Cardinal. This he wholly failed to do. Such inaction on his part created the good faith dissatisfaction of the employer which led to his discharge."

The undisputed evidence discloses that the parties lived under a construction requiring Maxwell to get "new business" as a condition for his continued employment; * and, it is undisputed that he failed to get new business and was discharged for that sole reason. See in this connection, Chief Justice Hickman's remarks to be found in James Stewart & Company v. Law, 149 Tex. 392, 233 S.W.2d 558, 561 (1950). See also, United Founders Life Insurance Co. v. Carey, 363 S.W.2d 236, 243 (Tex.Sup., 1962); Trinity Universal Ins. Co. v. Ponsford Brothers, 423 S.W.2d 571, 575 (Tex. Sup., 1968).

■ The employment contract is a "satisfactory performance" contract. The authorities governing this type of contract are discussed fully in Hardison v. A. H. Belo Corp., 247 S.W.2d 167, 168 (Tex.Civ.App.— Dallas, 1952, no writ) and Coker v. Wesco Materials Corporation, 368 S.W.2d 883, 884– 885 (Tex.Civ.App.—Eastland, 1963, no writ). Under this type of contract, the employer cannot be held liable for the discharge of the employee if he be honestly dissatisfied with the employee's work and his dissatisfaction is real and not pretended.

In this case, the facts and circumstances surrounding the whole transaction are not disputed. There is no evidence found in the record to sustain Maxwell's burden of prov-

---

* It is clear that defendant placed such a construction upon the agreement immediately after Maxwell entered into the "performance" of his obligations; indeed, Maxwell was upon "probation" for the last few months of his employment be-

cause of his failure to get "new business." During the intervening months, the record is devoid of evidence of any different construction placed on the contract by Maxwell.

ing that his discharge was not in good faith or that Cardinal's dissatisfaction was not real but pretended. Maxwell was given a four-month probationary period, September through December, 1967, in which to show that he could perform the required services. Maxwell admitted that from September on the situation "got worse." Arriving at the conclusion that the failure of Maxwell to secure new business was good cause for his discharge, the trial court instructed a verdict and rendered judgment for Cardinal. This court has reviewed the evidence favorable to Maxwell, disregarded all adverse evidence and inferences and has indulged every reasonable intendment and inference in favor of Maxwell as required in considering Maxwell's point of error. Air Conditioning, Inc. v. Harrison-Wilson-Pearson, 151 Tex. 635, 253 S.W.2d 422, 425 (1952). There is no evidence supporting said points of error.

In addition to the foregoing, we entertain grave doubts that the plaintiff declared upon an enforceable contract. Or, to state the question differently: Is the contract sued upon sufficiently certain to define the nature and extent of the obligation of the parties? The letter contract upon which the plaintiff declared is completely silent as to what duties, if any, he was to perform and the final proviso: "provided that you are able and satisfactorily perform the necessary services" adds nothing to the certainty required by the law. In Moore v. Dilworth, 142 Tex. 538, 179 S.W.2d 940, 942 (1944), the court said:

> "It is essential to the validity of a contract that it be sufficiently certain to define the nature and extent of its obligations. If an agreement is so indefinite as to make it impossible for a court to fix the legal liability of the parties thereto, it cannot constitute an enforcible [sic] contract."

Bendalin v. Delgado, 406 S.W.2d 897, 899 (Tex.Sup., 1966), uses these words to express the holding of the court:

> " 'A court cannot enforce a contract unless it can determine what it is. It is not enough that the parties think that they have made a contract; they must have expressed their intentions in a manner that is capable of understanding.' 1 Corbin, Contracts, 2nd ed. 1963, § 95. Thus, to be enforceable, a contract must be sufficiently certain to enable the court to determine the legal obligations of the parties thereto. Moore v. Dilworth, 142 Tex. 538, 179 S.W.2d 940."

See also: East Line & Red River Railroad Co. v. Scott, 72 Tex. 70, 10 S.W. 99, 103 (1888); 1 Williston on Contracts (3rd Ed., 1957), § 37, p. 108; 17 C.J.S. Contracts § 36(2), p. 652; 17 Am.Jur.2d, Contracts, § 75, p. 413; 13 Tex.Jur.2d, Contracts, § 98, p. 248; Restatement of the Law, Contracts, § 32, p. 40; Zukoski v. Baltimore & Ohio Railroad Co., 315 F.2d 622, 625 (3rd Cir., 1962). In Bonnevier v. Dairy Cooperative Association, 227 Or. 123, 361 P.2d 262, 266–269 (1961), is to be found a review of the subject generally.

Maxwell may use the instrument sued upon only as a means to escape the sanctions of the Statute of Frauds, Article 3995, Vernon's Ann.Civ.St., § 5, p. 51, and to establish the amount of his remuneration and the time for payment therefor. Every other element of the agreement of the parties must, of necessity, rest upon parol testimony. Maxwell may prevail only by showing that he was "able" to and actually did "satisfactorily perform the necessary services" required as a condition precedent to his being paid therefor. A showing of what "necessary services" were within contemplation of the parties must rest, entirely and absolutely, upon parol testimony for there is not a word in the writings which indicates even the general nature thereof.

Under such circumstances, consequently, one may well expect Maxwell to rely upon the line of cases holding that the extrinsic evidence rule does not preclude the enforcement of prior or contemporaneous agreements that are merely collateral to an inte-

grated contract, and not being inconsistent with its terms, do not attempt to vary or contradict them. An illustration is to be found in the carefully written opinion of Chief Justice Calvert in Hubacek v. Ennis State Bank, 159 Tex. 166, 317 S.W.2d 30, 32–33 (1958), in which the authorities are reviewed. The impact of the opinion in Hubacek is strengthened when we consider the late Justice Norvell's able dissent. See also, Arkansas Oak Flooring Co. v. Mixon, 369 S.W.2d 804, 806–807 (Tex.Civ.App.—Texarkana, 1963, no writ).

■ There is no doubt but that parol evidence is admissible for the purpose of determining the intent of the parties to the contract. Guardian Trust Company v. Bauereisen, supra; Murphy v. Dilworth, 137 Tex. 32, 151 S.W.2d 1004, 1005 (1941); King v. City of Dallas, 374 S.W.2d 707, 712 (Tex.Civ.App.—Dallas, 1964, error ref. n. r. e.). But, the courts are not permitted to make contracts for the parties under the guise of determining the intention of the parties thereto. See in this connection Moore v. Dilworth, supra, and Bendalin v. Delgado, supra, as well as the other authorities previously cited in connection therewith. If the contract is not enforceable because of its lack of certainty, the action of the trial court in entering judgment for the defendant was correct even though a different reason was assigned.

■ A proper judgment will not be disturbed merely because it is based upon a wrong conclusion of law. Andrews v. Key, 77 Tex. 35, 13 S.W. 640, 642 (1890); Houston Natural Gas Corporation v. Pearce, 311 S.W.2d 899, 908 (Tex.Civ.App. —Houston, 1958, error ref. n. r. e.). As Judge Lipscomb said in Roeser v. Bellmer, 7 Tex. 1 (1851): "If a correct decision of the case is made, a wrong reason given by the judge cannot affect it." Cf. Cagle v. United States Fidelity & Guaranty Company, 389 S.W.2d 945 (Tex.Sup., 1965).

Each and all of Maxwell's points of error are overruled and the judgment of the trial court affirmed.

STEPHENSON, Justice (dissenting).

I respectfully dissent. I would reverse and remand this case for a new trial because questions of fact were raised in the trial court that should have been submitted to the jury for determination.

Even though the majority opinion contains the statement that only favorable evidence to Maxwell was considered and all adverse evidence was disregarded, a close examination of the opinion reveals the contrary to be true. Plaintiff's case is stated in its worst possible light.

In the series of points, plaintiff has brought before this court, it is first insisted that the evidence did not establish "good faith dissatisfaction" on the part of defendant as a matter of law. It is also urged that the evidence did not establish as a matter of law that the term "necessary services" used by defendant in its letter of November 29, 1967, included the obligation on plaintiff's part to secure new business.

I consider the memorandum of agreement dated November 16, 1967, and the letter of November 29, 1967, as the written agreement between these parties in an attempt to arrive at their intentions. The rule is well stated by Chief Justice Calvert, speaking for the Supreme Court of Texas in Board of Ins. Com'rs v. Great Southern Life Ins. Co., 150 Tex. 258, 239 S.W.2d 803, 809 (1951):

"'Where several instruments, executed contemporaneously or at different times, pertain to the same transaction, they will be read together although they do not expressly refer to each other.'"

The crucial words set forth in the letter of November 29, 1967, are "providing that you are able to satisfactorily perform the necessary services." The record before us shows conclusively the reason defendant discharged plaintiff was that plaintiff had failed to secure new business. Yet, it is noted that there is no mention either in the memorandum of agreement dated Novem-

ber 16, 1967, or the letter of November 29, 1967, of any requirement by defendant of plaintiff that he was to secure new business. In fact, no specific duties are outlined, and only the words "necessary services" give any indication as to what plaintiff was being employed to do.

I have concluded from a study of all of the cases I have found on the subject that the parties to a contract may specifically provide that the employee's services must be performed to the satisfaction of the employer, in which event in a suit for wrongful discharge the burden of proof is upon the employee to establish as a fact that the employer did not act in good faith. In Watkins & Thurman v. Napier, 44 Tex. Civ.App. 432, 98 S.W. 904, 906 (Tex.Civ. App.—Dallas, 1907, no writ), the written contract provided that if the employer was dissatisfied at any time with the employee's services, the employment could be ended at the expiration of any month. The employee did not allege that no grounds for dismissal existed, and the evidence showed the employee disobeyed the employer's instruction as to selling its goods. That court held under these circumstances the employer was the sole judge as to whether he was dissatisfied. However, in Hardison v. A. H. Belo Corp., 247 S.W.2d 167, 168 (Tex.Civ.App.—Dallas, 1952, no writ), an employment contract for an indefinite period of time provided it should continue as long as the services were satisfactory to the employer. That court said: "But Texas follows the general or majority rule that the employer must be in good faith dissatisfied and that this presents a question of fact." The case was reversed and remanded to try that issue. The case of Dallas Hotel Co. v. Lackey, 203 S.W.2d 557, 563 (Tex.Civ.App.—Dallas, 1947, error ref. n. r. e.) holds that even though a contract may provide for employment satisfactory to the employer, there must exist a basis of genuine dissatisfaction. In Noa Spears Co. v. Inbau, 186 S.W. 357, 358 (Tex. Civ.App.—San Antonio, 1916, error dism.) the written contract provided for employ-

ment for a year conditioned upon plaintiff performing his contract "according to his ability and to the satisfaction of the first party." The jury found the employee performed his services to the satisfaction of the employer, although the employer testified to the contrary. The Court of Civil Appeals held that there was evidence to support the finding, and that the issue was properly submitted.

A different rule applies to a contract which is either silent entirely on the subject or requires satisfactory performance by the employee but does not show by its terms that the determination of "satisfaction" is to be made by the employer. In both of these instances the employee is required to perform his duties with reasonable satisfaction. The question of reasonable satisfaction is ordinarily a question of fact unless reasonable men could not differ on the subject. The case of Ingram v. Dallas County Water Control and Imp. Dist., 425 S.W.2d 366 (Tex.Civ.App.— Dallas, 1966, no writ) is an example of one in which the employment contract did not specifically cover the subject of satisfactory employment and the court held there would be an implied obligation to perform the services in a satisfactory manner. That court also said that there is an implied agreement on the part of the employer that he will not unjustly or wrongfully discharge the employee during the period of the contract. In Porter v. United Motels, Inc., 315 S.W.2d 340, 344 (Tex.Civ. App.—Waco, 1958, no writ), an oral agreement was made to employ plaintiff as a hotel manager as long as he faithfully and satisfactorily performed his duties as manager. That court held that it is the law that an employer may not discharge his employee during the period of employment except for good cause. That court also said:

"Furthermore, where performance is to be the satisfaction of one of the parties, his dissatisfaction must be founded on facts such as would induce action on the part of a reasonable man. He may

not act arbitrarily or without reason in the matter, and the law will say that he is satisfied with that with which he ought to be satisfied."

The case of Golden Rod Mills v. Green, 230 S.W. 1089, 1090 (Tex.Civ.App.—San Antonio, 1921, error dism.) involves a written contract which is not directly quoted. That opinion contained the following:

"There is no provision in the contract self executing that gives the absolute right to discharge appellee when not giving satisfactory service. We think there is a broad distinction between giving per se the right to discharge in certain cases where the matters are of such a personal character as not to need a jury to determine, and a contract where the employee contracts and obligates himself to perform in general terms satisfactory service."

The case of Dixie Glass Co. v. Pollak, 341 S.W.2d 530, 544 Tex.Civ.App.—Houston, 1960, error ref. n. r. e.) 162 Tex. 440, 347 S.W.2d 596 (1961), is a well-written opinion touching on this subject. The facts were that appellant employed appellee as comptroller for a period of five years with three five-year options. Appellee was discharged and brought suit contending his discharge was without good cause and secured a jury finding to that effect. Judgment was rendered for appellee and appellant contended the instruction attached to the issue as to good cause was erroneous. Such instruction defined good cause for discharge as meaning a failure of the employee to perform those duties in the scope of his employment as a man of ordinary prudence in an industry would have done under the same or similar circumstances. The case was reversed and remanded and it was stated:

"The court should have asked the jury whether the issues answered affirmatively showed acts by appellee so inconsistent with the employer-employee relation as to be good cause for discharge."

Under the facts of the case before us, an issue was raised for the jury as to whether defendant had good cause to discharge plaintiff. If defendant had intended for plaintiff to be obligated to secure new business as a condition for retaining his employment, such a provision could have been specifically included in either the memorandum of agreement to sell or the letter of November 29, 1967. Not only is there no written provision, but the testimony does not show an oral agreement to secure new business. Plaintiff testified as follows:

"Q. Maybe I better rephrase the question. Mr. Maxwell, my question was, at the time you signed that one agreement and at the time they gave you this other one, was there or not anything said that you would be required to obtain particular results or so much more new business in order to continue your employment?

"A. No, sir, it wasn't.

"Q. Did you or not ever make an agreement with Cardinal Petroleum Company that you would sell this business and guarantee any increase in business in order to continue the employment for five years?

"A. No, sir."

The record shows that defendant began to complain about the absence of new business shortly after the contract was made, and continued until the time of plaintiff's discharge. Plaintiff also admitted that he had stated that there were possibilities of increasing the business and that there was a possibility he could do a better job if he was relieved of some of the other problems. However, as said in the majority opinion, in passing upon the authority of the trial court to instruct a verdict, this court must review evidence favorable to appellant, disregard all adverse evidence and inference, and indulge every reasonable intendment and inference in favor of the one against

whom instruction was given. Air Conditioning, Inc. v. Harrison-Wilson-Pearson, 151 Tex. 635, 253 S.W.2d 422 (1952).

The record in this case does not establish as a matter of law that failure of plaintiff to secure new business was good cause for his discharge.

The last two paragraphs of the majority opinion indicate that the case is affirmed because the contract sued upon is not sufficiently certain, and therefore unenforceable. This is a matter that was not raised by the parties at any point of this litigation. Furthermore, there is no suggestion in any of the pleadings and no mention in the defendant's motion for instructed verdict, that defendant was entitled to judgment because the contract was unenforceable. There is no counterpoint in defendant's brief in this court raising this question.

The memorandum of agreement to sell dated November 16, 1967 contained this paragraph:

"It is understood and agreed that at the time a formal contract is prepared by Mission and Cardinal, the payments due to Mission by Cardinal under this agreement may be changed as to allocation between assets purchased, the consideration to be paid to Mission and A. P. Maxwell for their covenants not to compete, and the amount of annual salary to be paid A. P. Maxwell as an employee of Cardinal. Such allocation shall not, however, reduce the over-all consideration provided for herein."

This provision indicates the parties had one agreement encompassing the sale of the business by plaintiff to defendant, and the employment of plaintiff by defendant. The payment of an annual salary by Cardinal to Maxwell was a part of the over-all consideration for the combined transaction. According to such provision, defendant could change the allocation between the assets purchased, the payment for the covenant not to compete, and the amount of the annual salary to be paid plaintiff, but defendant could not reduce the over-all consideration provided for.

Defendant is not in a position to say, and in fact has not done so, that it will accept the benefits of the memorandum of agreement to sell, and retain the business sold to it, and at the same time contend the very agreement under which it purchased such business was so uncertain as to be unenforceable.