Reversed and Remanded; Remittitur Suggested, and Opinion filed July 29,
2008








Reversed and Remanded; Remittitur Suggested, and Opinion filed July 29, 2008.

 

 

In The

 

Fourteenth Court of
Appeals

_______________

 

NO. 14-06-00704-CV

_______________

 

REPIPE, INC., Appellant

 

V.

 

JAMES E. TURPIN, Appellee

                                                                                                               
                                

On Appeal from the 129th District Court

Harris County, Texas

Trial Court Cause No. 2004-30283

                                                                                                                        
                       

 

O P I N I O N

In this employment contract dispute,
the employer challenges the legal and factual sufficiency of the evidence
supporting the judgment.  Because the evidence is legally sufficient to support
the judgment and factually sufficient to support some, but not all, of the
damages awarded, we suggest remittitur.  If remittitur of the unsupported
damages is timely filed, we will reverse and remand for retrial of attorneys= fees consistent with the reduced
damage award; if it is not, we will reverse and remand for new trial.








I.  Factual
and Procedural Background

Appellant rePipe, Inc., a sewer-line
repair company, hired appellee James Turpin pursuant to a written Employment
Agreement (Athe Agreement@).  In the Agreement, the parties described Turpin=s duties as those Acommensurate and consistent with@ his employment as senior vice
president for human resources.  The parties further agreed that Turpin would
have additional duties and responsibilities as assigned by rePipe=s chief executive officer, provided
that any such newly-assigned duties were not inconsistent with Turpin=s then-current duties if he objected
in writing within ten days.

The Agreement also described the
different timing and consequences of resignation with or without AGood Reason.@  If Turpin resigned Awith Good Reason,@ then he would be considered a
part-time employee for one year and would be paid an amount equal to the
average of his compensation for the preceding two years.[1] 
If he resigned Awithout Good Reason,@ then the resignation would become
effective in thirty days and he would not receive compensation as a part-time
employee.

On April 22, 2004, rePipe announced
its restructuring.  Chief Executive Officer Tim Tarrillion issued a memorandum
explaining that the employment of rePipe=s vice president of sales and
marketing and its financial analyst was terminated and some of their former
duties were reassigned to Turpin.  On appeal, rePipe does not dispute that the
newly-assigned tasks were inconsistent in some material respect with the
position and responsibilities that Turpin held before the assignment. 

Turpin performed the new duties
without objection until June 2004.  Around that time, rePipe terminated
Tarrillion=s employment for cause.  According to rePipe, Tarillion had
misrepresented the company=s profitability.








On June 7, 2004, Turpin gave rePipe
written notice that, pursuant to the terms of the Agreement and effective
immediately, he terminated his full-time employment for Good Reason and
accepted part-time employment with rePipe.  In the notice, he listed several
reasons for his resignation, including rePipe=s failure to pay Turpin=s 2003 bonus and its  assignment of
duties to him, without his written consent, that were Ainconsistent in material respects@ with his then-current position and
responsibilities.  The next day, rePipe=s acting vice president wrote Turpin
that rePipe did not consider Turpin=s stated reasons for resigning to
constitute Good Reason under the Agreement; thus, it would treat Turpin=s letter as a notice of termination
without Good Reason.  

Turpin sued rePipe for breach of
contract and declaratory judgment, and the jury returned a verdict in his
favor.  As relevant to this appeal, the jury made the following findings: 

$                  
Turpin terminated his employment
for Good Reason as defined by the Agreement;

$                  
rePipe=s failure to acknowledge such termination caused
Turpin past damages in the amount of $277,747.56;

$                  
rePipe failed to pay Turpin the
discretionary, Anon-financial@
portion of his 2003 bonus;

$                  
rePipe=s failure to pay Turpin the non-financial bonus caused
Turpin $16,976.92 in damages;

$                  
rePipe=s failure to comply with a material obligation of the
Agreement was not excused; and

$                  
the reasonable
fees for the necessary services of Turpin=s attorneys totaled $131,000.00 for
preparation and trial, $50,000.00 in the event of an appeal, and $25,000.00 in
the event of an appeal to the Texas Supreme Court.  

The trial court rendered judgment on
the jury=s verdict,[2]
and this appeal ensued.

II.  Issues Presented








In three issues, rePipe challenges
the legal and factual sufficiency of the evidence supporting (a) the jury=s finding that Turpin resigned for a
Good Reason, (b) its award of $277,747.56 as compensation damages, and
(c) its determination that rePipe failed to pay Turpin his 2003
non-financial bonus in the amount of $16,976.92.  In its fourth issue, rePipe
challenges the award of attorneys= fees.

III. 
Standard of Review

To determine whether the evidence is
legally sufficient to support the judgment, we review the entire record,
crediting favorable evidence if reasonable jurors could and disregarding
contrary evidence unless reasonable jurors could not.  City of Keller v.
Wilson, 168 S.W.3d 802, 827 (Tex. 2005).  We assume that jurors decided
questions of credibility or conflicting evidence in favor of the verdict if
they reasonably could do so.   Id. at 819, 820.  If the evidence would
enable reasonable and fair‑minded people to differ in their conclusions,
then it is legally sufficient to support the verdict.  Id. at 822.  We
do not substitute our judgment for that of the trier‑of‑fact if the
evidence falls within this zone of reasonable disagreement.  Id.  When
reviewing a jury finding for factual sufficiency, we consider and weigh all of
the evidence in a neutral light and conclude that the finding is not supported
by sufficient evidence only if the finding is so contrary to the overwhelming
weight of the evidence as to be clearly wrong and unjust.  See Cain v. Bain,
709 S.W.2d 175, 176 (Tex. 1986) (per curiam).

IV.  Analysis

A.        Termination for Good Reason

In its first issue, rePipe asserts
that the evidence is legally and factually insufficient to support the jury=s finding that Turpin resigned for
Good Reason as that phrase is defined in the Agreement.  According to rePipe,
the relevant provisions of the Agreement imposed the following requirements: 








[I]f Turpin objected to the
assignment of new responsibilities in writing within ten days, but rePipe
nevertheless insisted that Turpin perform the unwanted new responsibilities,
then Turpin would have 180 days during which he could resign for a AGood Reason@Cunless, during those 180 days, he
withdrew his timely objection and forfeited his AGood Reason@ by giving written consent to the new
responsibilities.[3]

RePipe contends the evidence is
legally and factually insufficient because Turpin admits he did not object in
writing within ten days of the April 22, 2004 assignment of inconsistent
duties.  Turpin, however, argues that the Agreement did not condition his right
to resign for Good Reason upon such an objection.[4] 
To evaluate rePipe=s argument, we first must determine whether the Agreement
required Turpin to object before resigning as rePipe contends.

1.         Contract
Construction








Our primary concern in interpreting a
contract is to ascertain the true intent of the parties as expressed in the
contract.  Seagull Energy E&P, Inc. v. Eland Energy, Inc., 207
S.W.3d 342, 345 (Tex. 2006).  Ordinarily, the writing alone is sufficient to
express the parties= intentions, Afor it is objective, not subjective, intent that controls.@  Matagorda County Hosp. Dist. v.
Burwell, 189 S.W.3d 738, 740 (Tex. 2006) (per curiam) (quoting City of
Pinehurst v. Spooner Addition Water Co., 432 S.W.2d 515, 518 (Tex. 1968)). 
We examine the writing as a whole in an effort to harmonize and give effect to
all the provisions of the contract so that none will be rendered meaningless.  J.M.
Davidson, Inc. v. Webster, 128 S.W.3d 223, 229 (Tex. 2003); Coker v.
Coker, 650 S.W.2d 391, 393 (Tex. 1983).  We presume that the parties to a
contract intend every clause to have some effect.  Heritage Res., Inc. v.
NationsBank, 939 S.W.2d 118, 121 (Tex. 1996).  Thus, no single provision
will be given controlling effect, and all provisions will be considered with
reference to the entire contract.  J.M. Davidson, 128 S.W.3d at 229.  We
give terms their plain, ordinary, and generally accepted meaning unless the
contract shows the parties used them in a technical or different sense.  Heritage
Res., 939 S.W.2d at 121.

If the parties have entered into an
unambiguous writing, we will enforce the parties= intentions as expressed in the
contract.  Matagorda County Hosp. Dist., 189 S.W.3d at 740.  To
determine if a contract is ambiguous, we first examine the words the parties
chose to use, and considering the business activity to be served, determine
whether both proffered interpretations are reasonable.  XCO Prod. Co. v.
Jamison, 194 S.W.3d 622, 628 (Tex. App.CHouston [14th Dist.] 2006, pet.
denied).  If both interpretations are reasonable, then the contract is
ambiguous and there is a genuine issue of material fact regarding the parties= intent.  J.M. Davidson, 128
S.W.3d at 229.  But if only one interpretation is reasonable, we will enforce 
the contract according to its terms.  XCO, 194 S.W.3d at 628. 

2.         Terms of the Agreement

The sections of
the Agreement that are central to rePipe=s first issue
provide as follows:

Section [5(b)]  Termination by the Employee. 
(i) The Employee will be entitled to terminate his Employment (A) for
a Good Reason at any time within 180 days after the facts or circumstances
constituting that Good Reason first exist and are known to the
Employee . . . .  

 

AGood Reason@
for the Employee=s termination of his Employment
means: . . . (iii) the assignment to the Employee
without the Employee=s written consent of duties inconsistent in any
material respect with the Employee=s
then current positions, authority, duties or responsibilities . . . . 

 








These unambiguous terms allow an
employee to terminate his employment for Good Reason within 180 days after
learning that rePipe has assigned inconsistent duties to him without his
written consent.  Relying on these provisions, Turpin argues that his
resignation fulfilled these requirements because (a) on April 22, 2004, he
was assigned duties Ainconsistent in any material respect@ with his Athen current positions, authority,
duties or responsibilities@; (b) he did not consent in writing to the assignment;
and (c) he sent rePipe his notice of termination for Good Reason less than
180 days later.[5]  

On appeal, rePipe does not dispute
that the April 2004 changes to Turpin=s duties were inconsistent in some
material respect with the responsibilities that had previously been assigned to
him.  Instead, rePipe argues that the newly-assigned tasks must be considered
part of Turpin=s Athen current@ responsibilities because Turpin
failed to object in writing to the assignment within ten days.  In support of
this interpretation, rePipe relies on the following provision of the Agreement:


Section 2.  Employment.
(a)(i) the Company will employ the Employee as its Senior Vice President,
Human Resources . . . , (iii) The Employee also will
have such additional powers, authority, functions, duties and responsibilities
as the chief executive officer of the Company . . . may assign to the Employee
from time to time; provided that any such assignment . . . shall not be
inconsistent or interfere with, or detract from, those herein vested in, or
otherwise then being performed for the Company by[] the Employee if the
Employee objects in writing within ten days of the date on which the chief
executive officer or his delegate advises the Employee of that assignment.

According to
rePipe, this part of the Agreement required Turpin to provide rePipe with
notice of his objections so that rePipe would have an opportunity to overcome
them.  As rePipe=s trial counsel explained in closing
argument, ABefore [Turpin] sent in his resignation letter, he never gave rePipe a decent chance to
address the things he was complaining about and try to fix them, because he
never gave rePipe fair notice about his complaints.@  

3.         Harmonizing
the Provisions








RePipe=s interpretation is inconsistent with
the unambiguous language of the Agreement in several respects.  First, the
Agreement does not require Turpin to give rePipe an opportunity to remedy the
conditions that constitute Good Reason for his resignation.   To the contrary,
Section 5(b)(i)(A) of the Agreement provides that Turpin is entitled to resign
for Good Reason Aat any time within 180 days@ after learning of the assignment of
inconsistent duties (emphasis added).

            Second, under rePipe=s interpretation of the Agreement,
rePipe could alter Turpin=s duties without his consent and without risk that he would
terminate his employment for Good Reason.  Instead, it could add or remove
responsibilities and wait to see  if he objected within the ten-day window. 
This is inconsistent with Section 1 of the Agreement, under which Good Reason
is defined to include Athe assignment to the Employee without the Employee=s written consent of duties inconsistent in any
material respect@ with his then-current duties.  (emphasis added).  The
parties did not include material changes in Turpin=s duties Ato which he did not object@ or Awhich rePipe requires Turpin to
perform despite his written objections@ among the circumstances constituting
Good Reason for termination.








RePipe=s interpretation also ignores the
conditional phrase, Aprovided that.@[6]  The parties agreed that rePipe could assign
additional duties provided that, if Turpin objected, then the duties
assigned Ashall not be inconsistent
or interfere with, or detract from@ Turpin=s existing duties (emphasis added). 
Thus, rePipe=s interpretation that Good Reason exists only if rePipe requires Turpin
to perform duties over his objection cannot be correct, because the Agreement
prohibits rePipe from materially changing Turpin=s duties over his objection.  See
Hohenberg Bros. Co. v. George E. Gibbons & Co., 537 S.W.2d 1, 3 (Tex.
1976) (explaining that the term Aprovided that@ is a limiting clause that conditions
performance on some act or event); accord, Marsh v. Marsh, 949
S.W.2d 734, 744 (Tex. App.CHouston [14th Dist.] 1997, no writ) (same).  The Aobjection@ provision is directed at Turpin=s responsibilities during his
employment, and gave Turpin the power to Aveto@ the assignment of inconsistent
duties to him.  It does not, however, impose an additional condition on his
ability to resign for Good Reason.

In sum, we conclude that the Agreement
is subject to only one reasonable interpretation.  See Universal Health
Servs., Inc. v. Renaissance Women=s Group, P.A., 121 S.W.3d 742, 746 (Tex. 2003); Columbia
Gas Transmission Corp. v. New Ulm Gas, Ltd., 940 S.W.2d 587, 589 (Tex.
1996); XCO, 164 S.W.3d at 632.  Because the unambiguous terms of the
Agreement did not require Turpin to object to the assignment before he could
have Good Reason to resign, his failure to object does not render the evidence
of Good Reason for his resignation legally or factually insufficient.  We
therefore overrule rePipe=s first issue.

B.        Compensation
Damages

In its second issue, rePipe argues
that the evidence is legally and factually insufficient to support the jury=s finding that Turpin was entitled to
$277,747.56 for unpaid compensation.  This argument requires us to determine
the legal effect of the following uncontroverted facts and contract terms: 

$                  
Under the terms of the Agreement,
an employee who terminates his employment for Good Reason becomes a part-time
employee.  

$                  
A part-time employee is paid an
amount equal to the average of the employee=s
compensation in the preceding two years.  

$                  
On June 7, 2004, Turpin notified
rePipe in writing that, effective immediately, he terminated his full-time
employment for Good Reason and accepted part-time employment with rePipe.  

$                  
The average of Turpin=s 2002 and 2003 compensation is $228,386.70.

$                  
On March 20, 2006, a few weeks
before trial, rePipe received a letter from Turpin in which he stated that he
continued to be an AActive Status Employee@ because rePipe Awrongfully blocked@
his prior notice of termination.  Turpin stated that he was terminating his
employment for Good Reason and accepting part-time employment on March 20,
2006.

$                  
The average of the compensation
Turpin would have received as an active, full-time employee in 2004 and 2005 is
$277,747.56. 

 








RePipe argues that if Turpin
terminated his employment for Good Reason, then he did so on June 7, 2004. 
Because the compensation due for Turpin=s part-time employment is based on the
average of his 2002B03 compensation, and Turpin testified without contradiction
that this average is $228,386.70, rePipe argues there is legally and factually
insufficient evidence to support the award of $277,747.56.  

It is Turpin=s position that
rePipe Ablocked@ the commencement
of his part-time employment in June 2004; therefore, he continued to be
actively employed on a full-time basis at the time of trial.  He contends there
is sufficient evidence to support the jury=s award because,
based on an effective part-time employment date at the close of trial in 2006,
he is entitled to recover the average of the compensation he would have earned
in 2004 and 2005.  According to Turpin, the jury=s finding is
supported by his testimony that this average is $277,747.56.  

In support of his
argument, Turpin relies on the following provision of the Agreement:

Section 3.  Term of Employment. 
Subject to the provisions of Section 5, the term of the Employee=s Employment will be for an initial
term of two years, provided that, beginning on the first anniversary of the
Effective Date, the term of the Employee=s Employment will be for a term of one year commencing on
that anniversary date and renewing each day thereafter for an additional day
without any further action by either the Company or the Employee until an event
has occurred as described in, or one of the parties has made an appropriate
election pursuant to, Section 5.  After the Termination Date has occurred and
the Company has paid to the Employee all the applicable amounts Section 5
provides the Company will pay as a result of the termination of the Employee=s Employment, including all amounts
accruing during the Part-time Employment Period, if any, this Agreement will
terminate and have no further force or effect . . . .

 

Section 5
addresses the compensation owed to an employee after termination.  Reading
these sections together, Turpin asserts that his full-time employment continued
to renew every day until the post-termination compensation due to him under
Section 5 of the Agreement was paid in full.  








This interpretation, however, is
contradicted by the plain language of the Agreement.  Section 3 provides that
Turpin=s employment did not renew after Aone of the parties has made an
appropriate election@ under Section 5 of the Agreement.  Here, Turpin elected to
terminate his full-time employment for Good Reason pursuant to Section
5(b)(i)(A) on June 7, 2004; thus, the Employment Agreement was not renewed
again, and he spent the final year of his employment as a part-time employee.[7] 


Despite Turpin=s assertions to the contrary, rePipe
did notCindeed, could notCAblock@ Turpin=s part-time employment.  The
Agreement provides that if the employee terminates his employment for Good
Reason, then he becomes a part-time employee on Athe date the Nonterminating Party
receives the Terminating Party=s Notice of Termination.@  Thus, regardless of whether rePipe
agreed that he had Good Reason to resign or even acknowledged receipt of the
notice, Turpin=s part-time employment began when rePipe received his notice of
termination for Good Reason on June 7, 2004.  








Under the unambiguous terms of the
Agreement, Turpin=s compensation as a part-time employee is equal to the
average of his compensation in the preceding two years, and the evidence is
uncontroverted that the average of his 2002 and 2003 compensation is
$228,386.70.  Because Turpin=s testimony supports part of the damage award, it is some
evidence of damages, and the evidence is legally sufficient to support the jury=s finding; however, the evidence is
factually insufficient to support an award in excess of $228,386.70.  We
therefore sustain rePipe=s second issue in part, and suggest that Turpin remit 
$49,360.86 of the compensation found by the jury.  See Tex. R. App. P. 46.3; Larson v.
Cactus Util. Co., 730 S.W.2d 640, 641 (Tex. 1987) (AIf part of a damage verdict lacks
sufficient evidentiary support, the proper course is to suggest a remittitur of
that part of the verdict.  The party prevailing in the trial court should be
given the option of accepting the remittitur or having the case remanded.@).

C.        Non-Financial
Bonus Award 

RePipe argues in its third issue that
the evidence is legally and factually insufficient to support the jury=s finding that rePipe did not pay
Turpin one of the bonuses he earned in 2003.  According to rePipe, the bonus
was contingent upon rePipe meeting its financial targets as well as its
non-financial goals, and because rePipe did not meet its financial objectives
in 2003, no bonus was due.[8] 
Alternatively, rePipe contends the evidence conclusively established that the
bonus at issue has been paid in full.  To evaluate these arguments, we return
to the language of the Employment Agreement.

1.         Entitlement
to the Non-Financial Bonus

Section 4(b) of the Agreement
provides:

Performance-based awards under the Bonus Plan
(i) will include awards to Bonus Plan participants who have operating
control and responsibility for areas of the Company=s operations if those areas achieve their applicable
earnings before interest and taxes as budgeted by the Board and (ii) may
include awards to Bonus Plan participants based on other criteria the
Compensation Committee may establish in its sole
discretion. . . . Schedule 4(b) to this Agreement sets
forth the format for the Company=s
Executive Bonus Plan and the specific criteria for the Employee=s bonus under the Bonus Plan for the year ended
December 31, 2000.

 

Section 4(b)(i) addresses bonuses for
employees with control of operations, and makes such bonuses contingent on achievement
of earnings goals.  At trial, these types of bonuses were referred to as Afinancial bonuses.@  Section 4(b)(ii), however, allows
rePipe=s Compensation Committee (Athe Committee@) to base bonus awards on Aother criteria.@  The parties refer to these awards
as Adiscretionary@ or Anon-financial@ bonuses. The two types of bonuses
are assessed, funded, and timed differently, according to Schedule 4(b) (Athe Schedule@) attached to the Agreement.








a.         The AEBITDA Bonus Pool@

Under the Schedule, the total Aexecutive bonus pool@ from which bonuses are paid consists
of two portions.  Seventy-five percent of the bonus pool is determined by the
financial performance of rePipe=s parent company, rePipe Holdings, Inc. (AHoldings@) and its subsidiaries.  This portion
of the bonus pool, referred to in the Schedule as Athe EBITDA bonus pool,@ consists of a percentage of the
collective Aexcess EBITDA@ of Holdings and its subsidiaries.  AExcess EBITDA@ is defined as A[a]ctual pre-bonus earnings before
interest, taxes, depreciation and amortization (>EBITDA=) minus: cash fixed charges on debt
and preferred stock; capital expenditures; the change in working capital from
the beginning of the year; and estimated bonus payments.@  The percentage of Aexcess EBITDA@ comprising the EBITDA bonus pool
must be approved by the Committee each year in conjunction with the approval of
the annual budget.  

Half of each executive=s expected financial bonus is paid in
quarterly installments, and the other half is due after completion of rePipe=s annual audit.  Both of these
distributions are made Afrom the EBITDA bonus pool.@ 

b.         The
ADiscretionary Pool@

The remaining twenty-five percent of
the executive bonus pool is Aestablished at the full discretion of the Committee to reward
the successful achievement of non-financial goals established annually for each
executive.@  The Schedule further provides that A[d]istribution of [a] discretionary
bonus will be based on the individual=s achievement of his/her individual
goals, as assessed by his/her supervisor, and the total discretionary pool
established by the Committee.@  Additionally, the Schedule provides that, unlike the
financial bonus, A[t]he entire discretionary component of each employee=s bonus for each year will be funded
and paid after completion of the annual audit for that year.@ 

c.         Bonus
Eligibility








According to rePipe, a non-financial
bonus was not due because rePipe did not meet its financial targets in 2003. 
This argument is based on the statement in the Schedule, AThe executive bonus plan for rePipe,
Inc., provides for annual bonuses based on percentages of rePipe=s executive employees= base salaries if the financial
targets and non-financial goals of [Holdings] are achieved.@  

In interpreting the Agreement,
however, A[n]o one phrase, sentence, or section [of a contract] should be isolated
from its setting and considered apart from the other provisions.@  See Forbau v. Aetna Life Ins.
Co., 876 S.W.2d 132, 134 (Tex. 1994) (quoting Guardian Trust Co. v.
Bauereisen, 132 Tex. 396, 404B05, 121 S.W.2d 579, 583 (1938)). 
Reading the contract as a whole, we cannot say that this language means that no
non-financial bonuses are due if rePipe (or its parent company) fails to meet
its financial goals.

First, the Agreement provides that
the Committee may award bonuses based on other criteria it establishes in its
sole discretion.  In addition, financial bonuses are paid from one pool of
funds linked to financial performance, but non-financial bonuses are paid from
a separate  pool for the express purpose of rewarding the achievement of
non-financial goals. 

Moreover, the Schedule expressly
provides that distribution of non-financial bonuses is based on (a) the
executive=s achievement of his or her individualized annual goals, as assessed by
the executive=s supervisor, and (b) the total discretionary pool established by
the Committee.  These specific provisions express the parties= intent to define, assess, and reward
non-financial achievement separately from financial performance.  See id.
at 133B34 (applying the principle that more
specific terms of a contract control more general terms).  

Here, Turpin=s individual non-financial bonus plan
was approved by the Committee and tied to criteria unrelated to rePipe=s financial performance.  The
evidence shows that his supervisor assessed Turpin=s performance and determined that he
had earned a non-financial bonus.  Turpin further testified that his 2003
non-financial bonus was earned, accrued, and awarded, but not paid.  We
therefore conclude that the evidence is both legally and factually sufficient
to support the conclusion that Turpin is entitled to receive a bonus based on
his achievement of non-financial goals in 2003.








2.         Payment of the Non-Financial Bonus

In its alternative argument, rePipe
contends that it overpaid Turpin=s 2003 financial bonus by an amount
exceeding any non-financial bonus owed.  This overpayment allegedly occurred
because, as previously discussed, half of an executive=s expected financial bonus is paid in
quarterly installments in the same year the bonus is earned.  Cassie Reeves,
rePipe=s human resources manager from 2001
to 2005, explained that these portions of the expected financial bonuses were
paid at A[t]he close of books following the
quarter.@  Based on payroll records, Reeves
further testified that Turpin received a financial bonus of $21,646.00 in
2003.  

But, the evidence is conflicting. 
Randy Jennings, rePipe=s chief accounting officer, testified that bonus payments
listed on the payroll records of a given year do not represent the bonuses
awarded for that year.  Jennings explained that bonuses are not paid in full by
the end of a calendar year, so there are Alag payments associated with the
bonus year.@  Turpin similarly testified that non-financial bonuses were paid during
the subsequent calendar year; thus, a bonus paid in 2003 may have been earned
in 2002.  When Jennings was asked if Turpin was Aoverpaid on his bonus,@ Jennings responded, AI don=t believe so.  I=m not sure.  I just remember that
issue coming up.@

Based on the conflicting evidence, we
cannot say that the evidence is legally or factually insufficient to support
the jury=s finding that rePipe failed to pay
Turpin the 2003 non-financial bonus. 

3.         Amount
of the Non-Financial Bonus        








RePipe also argues that the evidence
is legally and factually insufficient to support the amount of the damages
awarded for its failure to pay Turpin the 2003 non-financial bonus.  A
corporate bonus form generated by rePipe shows that Turpin earned 85% of the Atarget@  non-financial bonus amount of
$19,153, or $16,280.05.  Because this is some evidence to support the jury=s award of $16,976.92, the evidence
supporting the award is legally sufficient; however, there is no evidence in
the record that the amount of Turpin=s 2003 non-financial bonus exceeded 
$16,280.05.[9]

On this record, we conclude the
evidence is factually sufficient to support only part of the jury=s finding.  The evidence that Turpin
was owed a non-financial bonus in the amount of  $16,280.05 is legally and
factually sufficient to support this portion of the award, but it is factually
insufficient to support the larger amount found by the jury.  We therefore
sustain rePipe=s third issue in part and suggest that Turpin remit $696.87 of the bonus
award.

D.        Attorneys= Fees

In its final issue, rePipe argues
that Turpin is not entitled to recover attorneys= fees because he is not entitled to
prevail on his contract claims.  In the event of a partial reversal, however,
rePipe asks us to vacate the award of appellate attorneys= fees and remand for a reassessment
of those fees.  See Bossier Chrysler-Dodge II, Inc. v. Rauschenberg, 238
S.W.3d 376, 376 (Tex. 2007) (per curiam) (if damages are reduced, attorneys= fees should ordinarily be retried
unless appellate court is Areasonably certain that the jury was not significantly
influenced by the erroneous [damage award]@ (quoting Barker v. Eckman,
213 S.W.3d 306, 314 (Tex. 2006))). 

We sustain this issue.  Because we
cannot be reasonably certain that the jury was not significantly influenced by
the erroneous damage amounts it considered, we reverse the award of trial and
appellate attorneys= fees and remand the case for a new trial of these issues.  See
Young v. Qualls, 223 S.W.3d 312, 313 (Tex. 2007) (per curiam) (remanding
case for retrial of the attorneys= fees issues after party timely filed
the suggested remittitur).








V. 
Conclusion

We hold that the evidence is legally
and factually sufficient to support the portion of the judgment addressing
liability.  Although the evidence is legally sufficient to support the an award
of damages and factually sufficient to support part of the amount awarded, it
is factually insufficient to support the total damages awarded.  Pursuant to
Texas Rule of Appellate Procedure 46.3, we suggest a remittitur of $50,057.73,
representing reductions of $49,360.86 from the compensation award and $696.87
from the non-financial bonus award.  If Turpin files a remittitur within
twenty-one days from the date of this opinion, we will modify the trial court=s judgment to reflect the award of
$244,666.75 in compensatory damages, affirm that portion of the judgment as
modified, reverse the portion of the judgment awarding attorneys= fees, and remand the case for
retrial of that issue.  In the event a remittitur is not timely filed, we will
reverse the judgment and remand the case for a new trial.

 

 

 

/s/        Eva M. Guzman

Justice

 

Judgment rendered and Opinion filed
July 29, 2008.

 

Panel consists of Justices Yates,
Guzman, and Boyce. 









[1]  Such Apart-time
employment@ would not require Turpin to work for rePipe or
refrain for working for a different employer.  In effect, this was a severance
package.





[2]  The court conditioned the award of appellate
attorneys= fees on affirmance of the judgment.





[3]  Appellant=s
Br., at 6.





[4]  Turpin also advances two Awaiver@ arguments. 
First, he contends that, by failing to object to the question in which the jury
was asked if Turpin had Good Reason to resign, rePipe waived its challenge to
the jury=s finding.  We disagree.  RePipe does not contend that
this question should not have been submitted or should have been submitted
differently; rather, rePipe argues that its interpretation of the contract was
correct, and thus, the jury was required to answer the question in the
negative.  Turpin also argues that rePipe waived its challenge to this finding
by failing to address all possible grounds supporting the jury=s answer.  According to Turpin, the jury could have
found that he had Good Reason to resign because rePipe failed to pay Turpin=s 2003 bonus.  Because rePipe does challenge the jury=s finding that Turpin was not paid the 2003 bonus,
this argument is without merit. 





[5]  Although Turpin also contends that his duties
materially changed again during the first week of June 2004,  discussion of
this allegation is not necessary to our disposition of the case.





[6]  Although this point is not addressed by either
party, the interpretation of the unambiguous language of a contract presents a
question of law we review de novo by examining and considering all
provisions of the entire contract.  Coker, 650 S.W.2d at 393.





[7]  Moreover, the internal inconsistency of Turpin=s argument is apparent on its face: if the consequence
of rePipe=s failure to pay Turpin=s post-termination compensation is that Turpin=s full-time employment is renewed for another year,
then Turpin=s employment is no longer terminated, and rePipe does
not owe him post-termination compensation.





[8]  According to rePipe, the company lost $31 million in
2003.





[9]  RePipe asserts there is no logical connection
between the amount found by the jury and the evidence concerning the amount of
Turpin=s non-financial bonus.  The company correctly points
out that the figure awarded by the jury appears in the record only in a check
and its accompanying letter, in which rePipe=s
chief accounting officer explained that the check for $16,976.92 represents
payment for Turpin=s previously accrued but unused vacation days and
prorated car allowance.